**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**

—————————————————————x
                                             §
ANNE BECKNER AND ROBIN ANDERSON     §        C.A No. _____
*on behalf of themselves and all other similarly* §
*situated persons,*                          §
                                             §
                        Plaintiffs,          §
                                             §
            vs.                              §        **JURY TRIAL DEMANDED**
                                             §
NESTLÉ  USA INCORPORATED,             §
                                             §
                        Defendant.           §
—————————————————————x

## CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, bring this class action against Nestlé USA Incorporated ("Nestlé" or "Defendant") on their own behalf and on behalf of a class of all other similarly situated persons (the "Class"), including all persons who purchased infant formula packaged in metal cans lined with epoxy resins containing Bisphenol-A (2,2-bis (4-hydroxyphenly)-propane) ("BPA"), and produced, manufactured, sold and/or distributed by Defendant hereinafter referred to as ( "Contaminated Formula Products"). Plaintiffs bring this action for compensatory and equitable, injunctive and declaratory relief against Defendant for violation of various state deceptive trade practices acts, breach of warranty, misrepresentation and unjust enrichment. Plaintiffs allege upon personal knowledge matters pertaining to themselves and their own acts, and as to all other matters, upon information and belief, based upon the investigation undertaken by their counsel:

## I.      SUMMARY OF THE ACTION

1.      This action arises out of Nestlé's misrepresentations and/or omissions and failure to warn of and/or otherwise disclose or adequately disclose that its Contaminated Formula

Products are manufactured using a dangerous chemical that has been known for years to be toxic in several respects and which poses serious risks to an individual's health due to the fact that it leaches into food and beverages in the normal course of everyday use. Despite well-documented scientific evidence of the harmful effects of BPA on infants and children, Nestlé marketed its Formula Products which contain BPA as superior, in terms of safety and supporting healthy development of infants and young children, and created a relationship with consumers based on trust and safety. As discussed further below, a major component of the manufacturing of the Contaminated Formula Products is the sterilization process, which exposes the formula in the epoxy-lined metal cans to intense heat. BPA leaching is accelerated by heat. Thus, the epoxy lining that Nestlé claims protects the formula from the metal cans during the manufacturing process is precisely what causes the BPA contamination.

2. BPA, a chemical that Nestlé uses to make its Contaminated Formula Products, is a dangerous chemical that has been linked to serious human health problems. Indeed, for an extended period of time, researchers and scientists have been very concerned with the harmful effects of BPA. For well over a decade, hundreds of studies and papers, including very recent reports, have repeatedly shown that BPA can be toxic to humans at extremely low doses. Recent studies using laboratory animals, human tissue, and human subjects have confirmed significant health risks associated with exposure to very low levels of BPA. Furthermore, research shows that infants and young children are especially susceptible to the dangers of BPA.

3. Incredibly, and despite these facts, Nestlé continued to market its Contaminated Formula Products as healthy and safe and failed to provide truthful or adequate warnings and/or information about BPA on its Contaminated Formula Products or their packaging. Indeed, Nestlé knew or should have known, but failed to disclose or adequately disclose the following

material facts, *inter alia*: (1) that its Contaminated Formula Products contained BPA; (2) that numerous scientific studies performed by, among others, government scientists and university laboratories, had found health concerns associated with BPA; (3) that BPA leaching is accelerated by heat; and (4) that the industry studies provided to the United States Food and Drug Administration ("FDA") by chemical companies that manufacture BPA, and upon which Defendant relies in representing that BPA is safe, are flawed.

4.    Moreover, Nestlé made these misrepresentations and failed to disclose these material facts in the context of a relationship of trust, which it likewise deceptively promoted.

5.    Thus, while Nestlé pursued its strategy of marketing its Contaminated Formula Products to new parents, caregivers and other consumers as safe, its marketing of its Contaminated Formula Products concealed and/or omitted information material to consumers' purchasing decisions.  In addition, Defendant's marketing was false and deceptive in claiming its Contaminated Formula Products were safe and healthful. The goal of Defendant's scheme has been and remains clear – to keep parents and consumers ignorant of the potential dangers of BPA exposure and to reap significant financial rewards through this unlawful conduct to the detriment of Plaintiffs and the Class. In fact, through this fraudulent and deceptive scheme, Nestlé reaped millions of dollars in profits that it otherwise would not have obtained and caused Plaintiffs and Class members to expend money on products that they would not have purchased had they known the truth.

## II.    PARTIES

6.    Plaintiff Anne Beckner is a resident of the State of California.  She purchased Contaminated Formula Products containing BPA and bearing the mark of Defendant during the relevant time period.

7.      Plaintiff Robin Anderson is a resident of the State of California.  She purchased Contaminated Formula Products containing BPA and bearing the mark of Defendant during the relevant time period.

8.      Defendant Nestlé is a corporation with U.S. headquarters located at 800 North Brand Blvd., Glendale, CA  91203.  Nestlé develops, manufactures, markets, distributes, and sells Contaminated Formula Products in its Nestlé Nutrition division.  Nestlé has conducted and continues to conduct business in California and nationwide by distributing and selling its Contaminated Formula Products through various stores and supermarkets located throughout California and the United States of America.

9.      Despite Nestlé's nationwide sale of its Contaminated Formula Products, the most significant relationship between Nestlé on the one hand, and Plaintiffs and the Class on the other, occurs in California, the center of Nestlé's wrongful conduct.  As noted above, Nestlé's corporate headquarters are located in Glendale, California, where significant executive decisions are made, including the decision to sell Contaminated Formula Products containing BPA. Nestlé's corporate officers, including Chief Executive Officer and President Joseph M. Weller, Senior Vice President Peter D. Argentine, Senior Vice President, General Counsel and Secretary Kristin Adrian, Esq., Vice President and Treasurer Manfred R. Lehmann, and Vice President and Controller Kimberly A. Lund are located in Glendale, CA.

## III.   JURISDICTION AND VENUE

10.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332.  The Class includes more than 100 individuals.  Members of the Class are citizens of a state different from Defendant, and the amount of controversy, in the aggregate, exceeds the sum of $5,000,000.00, exclusive of interest and costs.

11.     Venue in this Court is proper pursuant to 28 U.S.C. §1391(a) because a substantial part of the events and/or omissions giving rise to the claims asserted herein occurred in this District, and Defendant is subject to personal jurisdiction in this District. Moreover, Defendant inhabits and/or may be found in this District and the interstate trade and commerce described herein is and has been carried out in part within this District.

## IV.     FACTUAL ALLEGATIONS

### A.     The Baby Formula Industry

12.     Baby formula is a synthetic version of mothers' milk and belongs to a class of materials known as dairy substitutes, which are made by blending fats, proteins, and carbohydrates using the same technology and equipment used to manufacture dairy products. Until the early 1990s, formula was sold as a pharmaceutical product. Salespeople presented their brands to pediatricians, who would then recommend the products to new mothers. In 1992, federal antitrust actions resulted in the manufacturers shifting to directly market their products to consumers. Now, in addition to pharmaceutical sales, manufacturers' marketing strategies rely heavily on direct mail campaigns as well as television and print advertising.

13.     Historically, the U.S. infant formula industry has been comprised of a small number of manufacturers with many of those manufacturers being owned by pharmaceutical companies. In 1987, three manufacturers, all owned by pharmaceutical companies, accounted for 99 percent of the total U.S. market share of infant formula: Ross Labs, owned by Abbott Laboratories; Mead Johnson, owned by Bristol-Myers; and Wyeth-Ayerst Laboratories, owned by American Home Products. Since 1987, several other companies have joined the U.S. infant formula market: Nestle, which owns infant formula manufacturers Carnation and Gerber; PBM Products; and a number of organic companies that are looking to break into the infant formula market.

14.     The manufacturing process for infant Contaminated Formula Products involves multiple steps and facilitates leaching of BPA into the infant formula during the packaging process.  *See* Randy Schueller, "Baby Formula: How Products are Made" Volume 4 (1996), available at *http://findarticles.com/p/articles/mi_gx5205/is_/ai_n19124707?tag=artBody;co11* at 3.  The ingredients of infant formula are mixed together, pasteurized, homogenized, subjected to a standardization process to ensure that key parameters such as pH, fat concentration, and vitamin and mineral are correct, and then packaged.  The packaging process generally involves pouring liquid formula into metal cans lined with BPA, using conventional liquid filling equipment commonly used in the food and beverage industry, after which the lids of the metal cans are crimped into place. After the formula is placed into the cans and the cans are sealed, there is an additional sterilization of the formula-filled metal cans by subjection to heat and cold to destroy any additional microorganisms. The finished cans are packed in cartons and stored for shipping.

## B.     Bisphenol A, Its Uses, and Human Exposure.

15.     As discussed above, this action concerns BPA, the toxic material used in Contaminated Formula Products produced, manufactured, distributed, and/or sold by Defendant. BPA is a component of epoxy resins widely used in consumer products, including can liners like those produced, manufactured, distributed, and/or sold by Defendant.  BPA is a synthetic estrogen known as "xenoestrogen" and acts as an endocrine disruptor.[1]

16.     The durability of the epoxy lining derives from its polycarbonate composition. Polycarbonate is a tough thermoplastic that is clear, lightweight and shatter-resistant. Consequently, these attributes have made polycarbonate the material of choice for a diverse

---

[1] Erickson, Britt (June 2, 2008). "Bisphenol A under scrutiny". *Chemical and Engineering News* 86 (22): 36-39, *available at* http://pubs.acs.org/cen/government/86/8622gov1.html.

range of products.  However, the chemical bond between BPA molecules is unstable and, with time and use, the chemical leaches into materials it comes into contact with (for example, formula).[2]  With respect to infant formula products produced by Defendant, liquid formulas and other food products sold in metal cans are lined with BPA-epoxy, which has been shown to leach into the formula itself.

17.    Although the epoxy resin containing BPA appears safe, it is actually dangerously flawed in a manner undetectable to the human eye.  The chemical bond that links BPA monomers to one another to form polymer chains is not stable; as a result, the polymers decay with time allowing BPA to "leach" invisibly from polycarbonate plastic containers and metal cans lined with epoxy resins containing BPA.[3]  When liquid or food comes into contact with the decayed area of a BPA epoxy resin can liner or polycarbonate plastic food container, BPA is released into the liquid or food in the container and subsequently ingested by the user.  This leaching of BPA into liquid or food is accelerated and exacerbated by heat; thus, when the Contaminated Formula Products are subjected to heat, — e.g. during the manufacturing and/or shipping process — the dangers associated with BPA exposure are heightened.

18.    According to the National Alliance for Breastfeeding Advocacy, BPA resins used as lacquers to coat metal products such as food cans have been shown to leach into the content of cans during the sterilization process, including cans of milk-based infant formula.  See Walker, Marsha; RN. "Contaminants In Infant Formula." International Board of Lactation Consultant

---

[2] See "Baby's Toxic Bottle", The Work Group for Safe Markets, at 6, available at
*http://chej.org/documents/BabysToxicBottleFinal.pdf.*

[3] A monomer is a small molecule that may become chemically bonded to other monomers to form a polymer.  A polymer is a substance composed of molecules with large molecular mass consisting of repeating structural units, or monomers, connected by covalent chemical bonds.  The individual molecules that comprise a polymer are referred to as polymer molecules.  In popular usage, the term "polymer" is used as a synonym for plastic.

Examiners (available at *http://www.naba-breastfeeding.org/images/Contaminants.pdf*) 2002. Thus, BPA leaches during the manufacturing process into the liquid formula itself.

19. A number of studies report that BPA definitely leaches into formula from the lining of the metal can in which it is packaged. One such study was published on December 5, 2007, by the Environmental Working Group ("EWG"), an independent non-profit research organization. In a test of six liquid formula samples, the EWG found an average of 5.3 parts per billion (ppb) of BPA in the infant formula, with a maximum of 17 ppb in some of the samples.[4] In addition to its own sampling, the EWG used baby formula sampling from a 1997 FDA study on BPA exposure in infant formula.[5] The 1997 study tested 14 liquid formula samples and found similar amounts of BPA with an average of 5 ppb and a maximum of 13 ppb.[6] The BPA ranges found in infant formula show a concentration at which concluded that infants fed the formula would be exposed to BPA at doses exceeding those that caused harm in laboratory studies.

20. The U.S. government recognizes key facts related to risks of harm from BPA. The National Toxicology Program ("NTP") noted, among other things, (i) that the primary source of exposure to BPA for most people is through the diet, in food and beverages; (ii) that BPA can migrate into food from food and beverage containers with internal epoxy resin coatings; and (iii) that the highest estimated intakes of BPA in the general population occur in infants and children. Infants and children have higher intakes of BPA because they eat, drink,

---

[4] *Guide to Infant Formula and Baby Bottles*, EWG (available at: http://www.ewg.org/book/export/html/25570)

[5] *See* Biles, J.A., T.P. McNeal, T.H. Begley and H.C. Hollifield, 1997, *Journal of Agricultural and Food Chemistry*, vol. 45.

[6] *See* EWG's Guide to Infant Formula and Baby Bottles: BPA in baby bottles, *available at* *http://www.ewg.org/node/25572* (citing EWG. 2007a. Toxic Plastics Chemical in Infant Formula. Environmental Working Group, Washington DC, a*vailable at*: *http://www.ewg.org/reports/bpaformula* [accessed 2009].) (citing Biles JE, McNeal TP, Begley TH. 1997. FDA-Determination of bisphenol A migrating from epoxy can coatings to infant formula liquid concentrates. J Agric Food Chem 45: 4697-700.).

and breathe more than adults on a pound-for-pound basis. Moreover, the toxic levels are of particular concern because of infants' inability to efficiently metabolize BPA.

21. The NTP also noted that bio-monitoring studies show that human exposure to BPA is widespread. The 2003 – 2004 National Health and Nutrition Examination Survey ("NHANES III") conducted by the Centers for Disease Control and Prevention ("CDC") found detectable levels of BPA in 93% of 2,517 urine samples from people six years and older. *See* National Institute of Environmental Health Sciences, *Since You Asked – Bisphenol A*, *http://www.niehs.nih.gov/news/media/questions/sya-bpa.cfm* (last visited Dec. 23, 2008). Almost all human exposure to BPA is through diet; with infants among the most exposed.[7]

22. The NHANES III study also revealed that females had statistically higher BPA levels than males, and children had higher concentrations than adolescents who, in turn, had higher concentrations than adults.[8]

23. Although this study did not include children younger than six years of age (the most affected demographic), the CDC NHANES III data showing increased exposure to women and children are considered representative of exposures in the United States because of the large number of people included in the survey and the process used to select participants.

**(1) Numerous Studies Have Associated BPA Exposure with Negative Health Effects**

24. For well over a decade, scientists have been concerned about the harmful effects of BPA on human health. Over 100 scientific studies have demonstrated the toxicity of BPA,

---

[7] "Draft Brief on Bisphenol A", National Toxicology Program, National Institute of Environmental Health Sciences, National Institutes of Health, U.S. Department of Health and Human Services (April 14, 2008), at 4 , available at http://cerhr.niehs.nih.gov/chemicals/bisphenol/BPADraftBriefVF_04_14_08.pdf.

[8] BPA exposure among pregnant women also results in exposure to the fetus. *See* Takahashi, O., et al., *Disposition of Orally Administered 2,2-Bis (4-hydroxyphenyl) propane (Bisphenol A) in Pregnant Rats and the Placental Transfer to Fetuses*, Environmental Health Perspectives 108: 931-935.

even at extremely low doses, and studies of humans and lab animals have confirmed significant

health risks associated with exposure to BPA.

25.    Frederick vom Saal, a leading BPA researcher, realized the effects of BPA at low

doses over a decade ago.[9]  His early studies found that doses 25,000 times below the level

considered safe by the government in fact harmed developing cells in mice.  Upon publication of

his work, representatives of BPA manufacturers ("the industry") encouraged him to delay further

publication of the actual dangers associated with BPA at everyday exposure levels.  Vom Saal

declined and has become a leading voice setting forth the deleterious effects of BPA at low

doses, as well as the ways in which industry studies have obscured these facts.

26.    A flood of information about BPA revealing both widespread human exposure

and negative effects at even extremely low doses sparked a call for a new risk assessment of the

compound.[10]  Studies have concluded that exposure to very low levels of BPA can cause changes

in brain structure and behavior,[11] and that BPA exposure adversely affects prostate

development[12] and causes precancerous prostate lesions.[13]  At very low levels of exposure,

research indicates that BPA stimulates androgen-independent (*i.e.*, therapy-resistant)

proliferation of prostate cancer cells,[14] increases the potency of prostate tumors,[15] speeds the

---

[9] *See* Lyndsey Layton, *Studies on Chemical In Plastics Questioned*, Wash. Post, Apr. 27, 2008, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2008/04/26/AR2008042602126_pf.html

[10] *See* vom Saal, F., et al., *An Extensive New Literature Concerning Low-Dose Effects of Bisphenol A Shows the Need for a New Risk Assessment*, Environmental Health Perspectives 115:8 (August 2005).

[11] *See* Kubo, K., et al., *Low dose effects of bisphenol A on sexual differentiation of the brain and behavior in rats*, Neuroscience Research 45: 345-356.

[12] *See* Timms, B. G., et al., *Estrogenic chemicals in plastic and oral contraceptives disrupt development of the fetal mouse prostate and urethra*, Proceedings of the National Academy of Sciences, 10.1073/pnas.0502544102.

[13] *See* Ho, S-M, et al., *Developmental Exposure to Estradiol and Bisphenol A Increases Susceptibility to Prostate Carcinogenesis and Epigenetically Regulates Phosphodiesterase Type 4 Variant 4*, Cancer Research 66:  5624-5632.

[14] *See* Wetherill, Y. B., et al., *The Xenoestrogen Bisphenol A Induces Inappropriate Androgen Receptor Activation and Mitogenesis in Prostatic Adenocarcinoma Cells*, Molecular Cancer Therapeutics 1: 515-524.

pace of sexual development and causes obesity,[16] impacts estrous cyclicity and plasma LH levels,[17] lowers sperm count in adult males,[18] and creates "superfemale" attributes.[19] Several weak estrogenic compounds including BPA are ***as powerful as estrogen*** at increasing calcium influx into cells and stimulating prolactin secretion.

27.     BPA has been detected in human follicular fluid, human amniotic fluid, and human breast milk, which clearly demonstrates prenatal, fetal, and neonatal exposure to BPA in humans.[20] Experiments with rats and mice have long demonstrated that low-level BPA exposure during fetal growth is linked to breast cancer[21] and increases the risk for other cancers in adults, affecting mammary tissue development[22] and increasing the presence of a chemical known to cause breast cancer.[23]

---

[15] *See* Ramos, JG, et al., *Prenatal Exposure to Low Doses of Bisphenol A Alters the Periductal Stroma and Glandular Cell Function in the Rat Ventral Prostate*, Biology of Reproduction 65: 1271-1277. speeds the pace of sexual development and causes obesity,

[16] *See* Hodeshell, K., et al., *Plastic bisphenol A speeds growth and puberty*, Nature 401: 762-764.

[17] See Rubin, B. S., et al., Perinatal Exposure to Low Doses of Bisphenol A Affects Body Weight, Patterns of Estrous Cyclicity, and Plasma LH Levels, Environmental Health Perspectives 109: 675-680.

[18] *See* Sakaue, M., et al., *Bisphenol-A Affects Spermatogenesis in the Adult Rat Even at a Low Dose*, Journal of Occupational Health 43: 185-190.

[19] *See* Oehlmann, J., et al., *Effects of endocrine disruptors on Prosobranch snails (Mollusca:Gastropoda) in the laboratory.  Part I: Bisphenol A and Octylphenol as Xenoestrogens*, Exotoxicology 9: 383-397.

[20] Ikezuki Y, et al. *Determination of bisphenol A concentrations in human biological fluids reveals significant early prenatal exposure*. Hum Reprod. 2002 Nov; 17(11):2839-41. Schönfelder G et al. *Parent bisphenol A accumulation in the human maternal-fetal-placental unit*. Environ Health Perspect. 2002 Nov;110(11):A703-7.  Kuruto-Niwa R, et al. *Measurement of bisphenol A concentrations in human colostrum.*  Chemosphere. 2007 66(6):1160-4. Ye X, et al. *Measuring environmental phenols and chlorinated organic chemicals in breast milk using automated on-line column-switching-high performance liquid chromatography-isotope dilution tandem mass spectrometry*. J Chromatogr B Analyt Technol Biomed Life Sci. 2006 Feb 2;831(1-2):110-5.

[21] *See* Murray, T. J., et al., *Induction of mammary gland ductal hyperplasias and carcinoma in situ following fetal bisphenol A exposure*, Reproductive Toxicology 23: 383-390.

[22] *See* Markey, C. M., et al., *In Utero Exposure to Bisphenol A Alters the Development and Tissue Organization of the Mouse Mammary Gland*, Biology of Reproduction 65: 1215-1223.

[23] *See* Durando, M., et al. *Prenatal Bisphenol A Exposure Induces Preneoplastic Lesions in the Mammary Gland in Wistar Rats*, Environmental Health Perspectives 115, No. 1 (January 2007).

28.     BPA is considered an "endocrine disruptor" and causes a response in cells similar to the effect of estradiol (an estrogen hormone).    BPA binds with estrogen-related receptors without replacing the activity of estrogen.  As a result, BPA adds a "false" estrogen effect in the body and off-sets the hormonal balance required for healthy human development.

29.     Studies show that low doses of BPA can disrupt other types of hormone action within cells, such as thyroid hormone.  BPA has been reported to suppress the activation of thyroid hormone-regulated genes in rats and competitively displace naturally occurring thyroid hormones.  These hormones regulate the rate of metabolism and the growth of many systems in the body.  Thyroid hormones play a significant role in brain development during fetal life.

30.     Studies show that BPA can alter the expression of several hundred genes with effects varying among specific tissues and depending upon the timing of exposure.[24]

31.     A recent review of scientific literature affirms that BPA can alter brain chemistry and the reproductive and immune systems in a variety of animals.[25]  Some research also indicates that the sexual behavior and sexual development of mice can be impaired and variably altered from BPA-induced hormone disruption.[26]   Another study found that female mice exposed to short-term, low doses of BPA experienced sudden and significant increases in genetic abnormalities in their eggs.[27]

---

[24] *See* Rachel Gibson, "Toxic Baby Bottles: Scientific study finds leaching chemicals in clear plastic baby bottles", at 4, Environment California Research & Policy Center, 2007.

[25] vom Saal, F. and Hughes, C.. 2005. An extensive new literature concerning low-dose effects of bisphenol shows the need for a new risk assessment. *Environmental Health Perspectives* 113(8): 926-933.

[26] Rubin B.S., Lenkowski J.R., Schaeberle, C.M., Vandenberg. L.N., Ronsheim. P.M., Soto. A.M. 2006.  Evidence of altered brain sexual differentiation in mice exposed perinatally to low environmentally relevant levels of bisphenol A. *Endocrinology* 147:3681-3691.

[27] Hunt, P., et al. 2003. Bisphenol A exposure causes meiotic aneuploidy in the female mouse. *Current Biology* 13(7): 546-553.

32.     In addition, chronic adult exposure to BPA causes insulin resistance.[28]  BPA levels are higher in women with a history of repeated spontaneous miscarriages[29] and BPA is known to cause aneuploidy, an underlying cause of spontaneous miscarriages and birth defects.[30] Exposures to BPA at very low levels, well below the level previously considered safe, are sufficient to promote fat cell (adipocyte) differentiation and accumulation of lipids in a cell culture line used as a model for adipocyte formation which cause human obesity,[31] and altered maternal behavior.[32]

33.     Moreover, metabolic differences between rats and humans suggest humans may be *more sensitive* to BPA than rats.[33]

34.     In addition, experiments "suggest[] that, following chemical damage, BPA continues to leach from polycarbonate even in the absence of further harsh treatment."[34]

35.     In November, 2006, a group funded by the National Institute of Health ("NIH") and comprised of 38 of the world's leading scientists with regard to BPA (the "Group"), met at Chapel Hill, North Carolina to examine the relationship between BPA and the negative trends in human health that have occurred in recent decades, such as increases in abnormal penile/urethra

---

[28] *See* Alonso-Magdalena, P., et al., *The Estrogenic Effect of Bisphenol-A Disrupts the Pancreatic B-Cell Function in vivo and Induces Insulin Resistance*, Environmental Health Perspectives 114:106-112.

[29] *See* Sugiura-Ogasawara, M., et al., *Exposure to bisphenol A is associated with recurrent miscarriage*, Human Reproduction 20: 2325-2329, August 2005.

[30] *See* Thomas, B. F., et al., *Bisphenol A exposure causes meiotic aneuploidy in the female mouse*, Current Biology 13: 546-553.

[31] *See* Masuno, H., et al., *Bisphenol A in combination with insulin can accelerate the conversion of 3T#-L1 fibroblasts to adipocytes*, Journal of Lipid Research 3:676-684.

[32] *See* Palanza, P., et al, *Exposure to a low dose of Bisphenol A during fetal life or in adulthood alters maternal behavior in mice*, Environmental Health Perspectives 110 (suppl 3): 415-422

[33] *See* Elsby, R., et al., *Comparison of the modulatory effects of human and rat liver microsomal metabolism on the estrogenicity of bisphenol A:  implications for extrapolation to humans*, Journal of Pharmacology and Experimental Therapeutics 297-103-113.

[34] *See* Thomas, B. F., et al., *Bisphenol A exposure causes meiotic aneuploidy in the female mouse*, Current Biology 13: 546-553.

development in males, early sexual maturation caused in females, increased neuron-behavioral problems such as ADD/HD and autism, increased childhood and adult obesity and Type II diabetes, regional decreases in sperm count, and an increase in hormonally mediated cancers, such as prostate and breast cancers. The Group gave heightened attention to the relationship between treatment with "low doses" of BPA and the many negative health outcomes confirmed by experimental studies in laboratory animals and in *in vitro* studies identifying plausible molecular mechanisms responsible for mediating such effects.

36.     This eminent collection of scientists concluded that the wide range of adverse effects of low doses of BPA in laboratory animals exposed both during development and in adulthood "is a great cause for concern with regard to the potential for similar adverse effects in humans." The Group also concluded that recent trends in human diseases relate to adverse events observed in experimental animals exposed to low doses of BPA, the specific examples of which include many of the harmful conditions described above.

37.     The Group found extensive evidence that negative health outcomes may not become apparent until long after developmental stage exposure to BPA has occurred. Furthermore, the Group's findings indicate that acute studies in animals, particularly traditional toxicological studies testing only high dose exposure to BPA, (like those relied upon by the chemical and plastic industries), do not accurately reflect exposure or effects in humans.

38.     In addition, recent academic studies concerning BPA and its potential effects on human health continue to demonstrate that BPA exposure is potentially harmful to infants, children and adults in many ways.

39.     A study on BPA's effects on human tissue funded and published by the National Institute of Environmental Health Sciences ("NIEHS"), a division of the NIH, released on

August 14, 2008, found that BPA suppresses adiponectin, the hormone that regulates insulin sensitivity in the body, placing people at a substantially higher risk for metabolic syndrome.[35] The study was performed using human tissue harvested from "tummy tuck," or abdominoplasty, gastric bypass, and breast reduction surgical patients. These findings link BPA exposure to ongoing human health risks *i.e.*, dangers in addition to and beyond developmental abnormalities in children. Among other things, the researchers noted these results were relevant to consideration of the American obesity epidemic. *See* Hugo, Eric, et al., *Bisphenol A at Environmentally Relevant Doses Inhibits Adiponectin Release from Human Adipose Tissue Explants and Adipocytes ENVIRONMENTAL HEALTH PERSPECTIVES* (Aug. 14, 2008).

40. Research on primates has shown central nervous system dysfunction associated with BPA exposure **within daily limits currently considered safe** by the FDA and the United States Environmental Protection Agency ("EPA"). There, scientists administered continuous low-dose BPA to primates at the limit specified as safe for daily exposure by the EPA. Even at this relatively low exposure level, BPA caused significant neurological damage, eliminating entirely certain synaptic responses in the spine (*i.e.*, BPA eliminated the ability of nerves to communicate with each other in the central nervous system of primates). The scientists conducting the study noted the profound implications of BPA's ability to interfere with spine synapse formation and certain synaptic responses in the prefrontal cortex[36] and the

---

[35] Metabolic syndrome is a combination of risk factors that include lower responsiveness to insulin and higher blood levels of sugar and lipids (leading to high blood pressure, heart disease, diabetes, obesity, etc.).

[36] The prefrontal cortex is the area of the brain linked with personality and "executive function," including planning complex cognitive behaviors, personality expression, and moderating correct social behavior. The basic activity of this brain region is considered to be orchestration of thoughts and actions in accordance with internal goals. The prefrontal cortex functions to determine a person's ability to differentiate among conflicting thoughts, determine good and bad, better and best, same and different, future consequences of current activities, working toward a defined goal, prediction of outcomes, expectation based on actions, and social "control" (the ability to suppress urges that could otherwise lead to socially-unacceptable outcomes).

hippocampus,[37] including that this remodeling of spine synapses may play a critical role in cognition and mood. This study, performed previously on rodents with consistent results, also suggests that the effect of BPA on rodents mimics closely the effects on primates, which are genetically closer to humans. Leranth, Csaba, et al., *Bisphenol A prevents the synaptogenic response to estradiol in hippocampus and prefrontal cortex of ovariectomized nonhuman primates, PROCEEDINGS OF THE NATIONAL ACADEMY OF SCIENCES* (Sept. 2, 2008) (*available at*, http://www.pnas.org/content/105/37/14187) (last visited Oct. 7, 2008).

41. On September 17, 2008, the Journal of the American Medical Association ("JAMA") published findings with respect to BPA exposure and the presence of BPA in adults, finding that BPA is associated with increased risk of certain diseases, including heart disease, diabetes, and liver problems. The scientists suggested these were effects of long-term, low-dose BPA exposure. Persons in the quarter of the population with the highest levels of BPA were more than twice as likely to be diagnosed with diabetes or heart disease, and were more likely to have elevated liver enzymes, which suggested stress to the liver.[38]

42. Beginning in November, 2007, Health Canada, a Canadian government agency, evaluated human and animal studies on BPA, as well as research on the manner by which BPA leaches from consumer products. Health Canada focused primarily on BPA's effect on newborns and infants up to 18 months of age and determined that the current safety margin ought to be wider. *See* CBS News, http://www.cbc.ca/news/background/health/bisphenol-a.html (last visited Dec. 23, 2008). In April 2008, officials for the Canadian health and environmental ministries officially declared BPA toxic and announced that a complete ban on manufacture of

---

[37] The hippocampus is part of the brain involved in formation, retention and consolidation of new memories, olfaction (sense of smell) and spatial coding/cognitive mapping (sense of direction).

[38] Lang, Iain A., *et al., Association of Urinary Bisphenol A Concentration With Medical Disorders and Laboratory Abnormalities in Adults,* JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, Vol. 300, No. 11, (Sept. 17, 2008).

BPA-containing baby bottles would be introduced within the year. That ban became effective in October, 2008.

### (2) Exposure to BPA is Especially Harmful to Babies

43. Of immediate and urgent concern is BPA's toxicity and its link to significant health problems and the risks of dangerous developmental, neural and reproductive health effects on infants and young children.

44. Testing by EWG and by the Food and Drug Administration ("FDA") indicates that under normal use, liquid formula could expose an infant to substantial amounts of BPA.[39] An August 2007 investigation by EWG estimated that at BPA levels found in Ready-To-Use liquid formula, 1 of every 16 infants fed the formula would be exposed to BPA at doses exceeding those that caused harm in laboratory studies.[40]

45. The primary source of exposure to bisphenol A for most people is through the diet.[41] Given the fact that babies are small and typically consume Defendant's Ready-To-Use formula as their sole, or main, source of food, babies that consume the Contaminated Formula are being exposed to high amounts of BPA.

46. The NTP testing determined that young animals metabolize bisphenol A less efficiently than adult animals.[42] It is understood that neonatal rats have higher concentrations of

---

[39] http://www.ewg.org/reports/infantformula.

[40] "EWG's Guide to Infant Formula and Baby Bottles: BPA in formula--how harmful?" *available at* http://www.ewg.org/node/25574.

[41] *See* "Draft NTP Brief on Bisphenol A", at 4, National Toxicology Program, National Institute of Environmental Health Sciences, National Institutes of Health, U.S. Department of Health and Human Services, April 14, 2008.

[42] *See id*. at 5.

BPA in their blood compared to older animals given an equal exposure.[43]  A reduced ability or efficiency to metabolize BPA is generally predicted for human fetuses and infants as well.[44]

47.     Children are especially vulnerable to BPA because endocrine disruptors affect how their bodies grow and develop.[45]  Young children still have immature organ systems, high metabolic rates, relatively low body weight, and are going through rapid physical development; therefore, even low levels of repeated exposure may lead to adverse health effects.[46]  An expert panel of the U.S. National Toxicology Program recently concluded that BPA exposure to fetuses and to children could impact their behavioral and neural systems.[47]  Exposure to children is particularly worrisome as children have immature detoxification systems, not equivalent to adults', and they are at a delicate stage of development.[48]

48.     While it is undisputed that children are particularly susceptible to the devastatingly harmful effects of endocrine disrupters like BPA, many of the problems associated with BPA exposure do not become obvious or recognizable until years after the exposure takes place.  Thus, there can be an unknown number of years in the life of a child before he or she is actually or correctly diagnosed with a disorder, disease, or illness caused by BPA.

49.     For these reasons, infants and children are particularly at risk from BPA exposure. BPA's adverse effects on a child's intellectual ability and growth, as well as the potential for exposure related disease(s), take years or even decades to detect or diagnose.

---

[43] *See id*. at 5.

[44] *See id.*

[45] *See* http://www.chej.org/documents/BabysToxicBottleFinal.pdf.

[46] *See* http://chej.org/documents/BabysToxicBottleFinal.pdf.

[47] *See* http://www.gentlenurturing.com/gentle_nurturing_newsroom/bisphenol_a_in_your_home/second_major_canadian_drops_bpa.

[48] *See* "Baby's Toxic Bottle", The Work Group for Safe Markets, at 8, *available at* http://chej.org/documents/BabysToxicBottleFinal.pdf.

50.     In the last year, research published by the United States Government has raised new concerns about the effects of BPA exposure to fetuses, infants, and children.  On April 14, 2008, the NTP's Center for the Evaluation of Risks to Human Reproduction ("CERHR"), a division of the U.S. Department of Health and Human Services ("HHS"), issued a draft brief indicating its agreement with a scientific expert panel on BPA that found that there was "some concern" for neural and behavioral effects in fetuses, infants, and children at current human exposures, based on effects in the prostate and mammary glands and early puberty in girls. *See Draft NTP Brief On Bisphenol A*, published Apr. 14, 2008, National Toxicology Program, National Institutes of Health, U.S. Dep't of Health and Human Services, *available at*, http://cerhr.niebs.nih.gov/chemicals/bisphenol/BPADraftBriefVF_04_14_08.pdf (last visited Dec. 23, 2008).

51.     Recently, on September 3, 2008, the NTP issued its final brief, which echoed the findings of the draft. *See NTP-CERHR Monograph on the Potential Human Reproductive and Developmental Effects of Bisphenol A*, September 2008, NIH Publication No. 08–5994 (the "NTP Brief") *available at*, http://cerhr.niehs.nih.gov/chemicals/bisphenol/bisphenol.pdf (last visited Dec. 23, 2008).  The NTP Brief found that infants' and children's BPA exposure far exceeded that of adults, and that there was "some concern" for risks to human health.  The NTP further stated that deleterious effects of BPA could extend beyond developmental and other systems related to estrogenic binding, and encouraged scientists to broaden their research in this area.  NTP Brief at 21.

52.     NTP observed that studies with laboratory rodents show that exposure to high dose levels of BPA during pregnancy and/or lactation can decrease survival rates, birth weight,

and growth rates of offspring early in life, and delay the onset of puberty in males and females. "These 'high' dose effects of [BPA] are not considered scientifically controversial and provide *clear evidence* of adverse effects on development in laboratory animals."  NTP Brief at 9.

53.     NTP also observed that a variety of neural effects, behavior alterations, precancerous lesions in the prostate and mammary glands, altered prostate gland and urinary tract development, and early onset of puberty in females have been reported in laboratory rodents exposed during development to much lower doses of BPA – levels consistent with current levels of human exposure.

54.     NTP concluded, in part, that current exposures to BPA are possibly high enough to cause concern:

> The 'high' dose effects of [BPA] in laboratory animals that provide clear evidence for adverse effects on development, *i.e.*, reduced survival, birth weight, and growth of offspring early in life, and delayed puberty in female rats and male rats and mice, are observed at levels of exposure that far exceed those encountered by humans.  However, estimated exposures in pregnant women and fetuses, infants, and children are similar to levels of [BPA] associated with several 'low' dose laboratory animal findings of effects on the brain and behavior, prostate and mammary gland development, and early onset of puberty in females.

NTP Brief at 32.

**C.     The Governmental Response to BPA has been Based on Flawed Studies and the Process Has Been Riddled With Conflicts of Interest**

55.     Federal agencies, including the FDA and the EPA, have been slow to recognize this clear evidence of harm associated with BPA exposure even in low doses.  In 1976, Congress passed the Toxic Substances Control Act, 15 U.S.C. §§2601 *et seq.* (1976), the first law in the country to regulate industrial chemicals.  Without any effort to affirmatively establish its safety, BPA was "grandfathered in," presumed safe by the EPA without evaluation of specific evidence. In addition, the FDA designated BPA to be among food contact items "Generally Recognized As

Safe."[49]    FDA, Safety and Food Packaging, *http://www.fda.gov/consumer/updates/foodpackaging081908.html* (last visited Dec. 23, 2008).[50]    The EPA has set daily limits for human exposure, within which it claims BPA exposure is safe; the EPA reference ("safe") dose for BPA is 50 ug/kg/day.[51]

56.     Despite years of scientific research raising questions as to its safety, the FDA has not altered its position with respect to the safety of BPA at current levels of human exposure.    On August 14, 2008, the FDA released a *Draft Assessment Of Bisphenol A For Use In Food Contact Applications*, and stated its preliminary conclusion that "an adequate margin of safety exists for BPA at current levels of exposure from food contact uses."    This draft report contradicted and rejected the findings of more than 100 studies performed by government scientists and university laboratories that found health concerns associated with BPA.

57.     However, the FDA's position was predicated upon flawed studies supplied by the Industry, which has a strong financial incentive in ensuring the longevity of this dangerous chemical. Indeed, the validity of the FDA's unwavering position with respect to BPA has also been questioned because the FDA has relied exclusively on industry studies although virtually all

---

[49] Generally Recognized As Safe ("GRAS") is a legal category set up by Congress under the 1958 Food Additives Amendment to the Federal Food, Drug, and Cosmetic Act.  According to the FDA, GRAS substances are those for which use in food has a "proven" track record of safety based either on a history of use before 1958 or on published scientific evidence, and that need not be approved by the FDA prior to being used.  FDA, GRAS: Time-Tested, and Trusted, Food Ingredients, http://www.fda.gov/fdac/features/2004/204_gras.html (last visited Dec. 23, 2008).  The FDA classifies certain chemicals and natural substances that are food additives and food contact substances as GRAS but nowhere maintains a complete list of all GRAS food contact items.   "Because the use of a GRAS substance is not subject to premarket review and approval by FDA, it is impracticable to list all substances that are used in food on the basis of the GRAS provision (21 C.F.R. §182.1). The use of a substance is GRAS because of widespread knowledge among the community of qualified experts, not because of a listing or other administrative activity." FDA, Frequently Asked Questions About Gras, http://www.cfsan.fda.gov/~dms/grasguid.html#Q1 (last visited Dec. 23, 2008).

[50] *See also* http://www.fda.gov/fdac/features/2004/204_gras.html; 21 C.F.R. §186.1.

[51] U.S. EPA 1993. Bisphenol A, CASRN 80-05-7. Washington, DC:Integrated Risk Information System, U.S. Environmental Protection Agency (*available at*, http://www.epa.gov/iris/subst/0356.htm (last visited Oct. 7, 2008)).

academic and government scientific research on the issue has called the validity of the industry's studies into question.

58.     Moreover, the independence of subsequent government inquiries of BPA has also come into question. Specifically, in February, 2007, it was revealed that Sciences International ("SI"), the sole firm contracted by the FDA to perform a survey of studies relating to BPA toxicity and potential reproductive hazards associated with exposure, also had major BPA manufacturers, including Dow Chemical and BASF, as corporate clients and was therefore faced with a serious, undisclosed conflict of interest in its evaluation and assessment of BPA. The House Oversight and Government Reform Committee launched an investigation of the conflict of interest policies of NIEHS, the NIH agency responsible for hiring the industry contractor SI to conduct the BPA review. Congressman Henry Waxman and Senator Barbara Boxer asked the Director of NIEHS, Dr. David Schwartz, to provide information on potential conflicts of interest involving SI.

59.     Ultimately, the government suspended and later fired SI because of concerns over its conflicts of interest. However, the BPA advisory panel, on whose behalf SI evaluated and reported on BPA, continued using the draft expert panel report prepared by SI, despite concerns as to accuracy and bias raised by advocates and independent scientists. Upon review by Tufts University biologist Dr. Ana Soto, nearly 300 errors were discovered in the SI draft report relied upon to form government policy on BPA.

60.     In response to a congressional inquiry from the Committee on Energy and Commerce, on February 25, 2008, the FDA admitted that its determination that current levels of BPA exposure pose no health risks was based on just two studies, both sponsored by the American Plastics Council, the trade group that represents BPA manufacturers (hereinafter, "the

industry"), one of which remains unpublished.[52]  These studies, discussed in FDA memoranda dated July 18, 2007 and July 24, 2007, consisted of the following: (i) *Two generation reproductive toxicity evaluation of Bisphenol A administered in feed to CD-1 Swiss mice*, sponsored by the American Plastics Council and submitted to the FDA in March, 2007 (unpublished and un-peer reviewed); and (ii) *Three generation reproductive toxicity evaluation of Bisphenol A in the feed to CD-1 (Sprague-Dawley) rats*, sponsored by the American Plastics Council and submitted to the FDA in 2000 (published in *Toxological Sciences* in 2002).  The published industry study was widely criticized by BPA experts for its fatal design flaws.  The second industry study has not been made available to the public and has not been published in a peer-reviewed journal to date.

61.    On October 29, 2008, the FDA Science Board Subcommittee on Bisphenol A released a scientific peer-review of the Draft Assessment prepared by the FDA reporting on Bisphenol A for use in food contact applications.  The Science Board Subcommittee found several shortcomings in the FDA Draft Assessment.  The Science Board Subcommittee criticized the FDA's failure to accurately estimate BPA contamination in infant formula, specifically with reference to its reliance on an inadequate number of samples and the FDA's use of mean values which masked the variability among samples.  The Science Board Subcommittee also noted the FDA's failure to consider over 100 independent studies performed by academic and government research labs, each of which found harms associated with low-dose exposure to BPA.

62.    With respect to the considerable scientific challenges the safety of BPA exposure at levels currently considered "safe," the Science Board Subcommittee stated in no uncertain terms that "[t]he draft FDA report does not articulate reasonable and appropriate scientific

---

[52] *See* February 25, 2008 Letter from Stephen R. Mason, FDA Acting Assistant Commissioner for Legislation, to Rep. John Dingell, Chairman House Energy and Commerce Committee.

support for the criteria applied to select data for use in the assessment," *id*. at 4, and disagreed with the FDA's decision to exclude government and academic research not performed under the "good laboratory practices" standards developed specifically for industry (not academic) research.

63.     In its report, the Science Board Subcommittee further affirmed the NTP's process and the research it considered, reiterating its conclusions that there is some concern associated with the contamination of infants and children with BPA at current levels of exposure. The Science Board Subcommittee specifically referenced recent studies on primates and humans linking BPA exposure in primates and humans to brain development issues, heart disease, diabetes, and other disorders as research improperly excluded from the FDA's Draft Assessment. The Science Board Subcommittee further recognized that the "no effects" level of BPA exposure set by the FDA was not supported by the available science.  The Subcommittee noted that the "weight-of-the-evidence ... provides scientific support for use of a point of departure substantially below (*i.e.*, at least one or more orders of magnitude lower than) the 5 mg/kg bw/day level selected in the draft FDA assessment." *Id*. at 4.  Most importantly, the Science Board Subcommittee noted that the FDA had not used scientifically valid means to determine safety levels for BPA contamination, noting that there is "a sufficient scientific basis to conclude that the Margins of Safety defined by FDA as 'adequate' are, in fact, 'inadequate.'" *Id*. at 4. The full Science Board of the FDA unanimously approved its Subcommittee's recommendations with respect to these issues on October 31, 2008.

64.     As recently as December 24, 2008, it was reported that the Science Board Subcommittee found, after receiving comments from an independent advisory panel, that the FDA should not have disregarded the numerous studies showing adverse health effects of BPA.

- 24 -

As noted above, the FDA's position was based on two studies performed by research groups that received funding from the American Plastics Council. In this regard, Dr. Mitchell Cheeseman, deputy director of the agency's Office of Food Additive Safety, noted the significant flaws in the FDA's evaluation of the two studies used by the FDA in connection with BPA.

**D.    Nestlé 's Wrongful Conduct.**

65.    Despite well-documented scientific evidence of the harmful effects of BPA on infants and children, Nestlé  has made misrepresentations and/or omissions and failed to disclose or adequately disclose that its Contaminated Formula Products are manufactured using a dangerous chemical recognized (and known to it) as toxic in several respects for years and which poses serious risks and harmful effects to individual health. To the contrary, Nestlé often highlights the healthfulness of its Contaminated Formula Products.

66.    Nestlé  offered products containing BPA, including but not limited to:

a.    NESTLÉ® GOOD START® DHA & ARA Formula

b.    NESTLÉ® GOOD START® NATURAL CULTURES™ Formula

c.    NESTLÉ® GOOD START® Formula

d.    NESTLÉ® GOOD START® SOY DHA & ARA Formula

e.    NESTLÉ® GOOD START® 2 DHA & ARA Formula

f.    NESTLÉ® GOOD START® 2 NATURAL CULTURES™ Formula

**(1)    Defendant's Deceptive Marketing of its Contaminated Formula Products**

67.    Nestlé 's business and marketing strategy at all relevant times targets consumers who are, among others, new and/or expecting parents and other consumers, by touting its Contaminated Formula Products as superior, in terms of both healthiness and safety, and by attempting to create a relationship based on trust and safety with its consumers. "Gerber and

Nestlé Nutrition have a combined 200-plus-year history of helping parents raise happy, healthy

babies. Moms can trust that all of our products meet the highest standards of safety and nutritional

support." Gerber, *http://www.gerber.com/about/press_room_detail.aspx?pressid=5050364c-cc9-*

*488b-9839_id8354b50a86* (last visited Jan. 14, 2009).

       68.    Indeed, Nestlé markets its commitment to safety as a reassurance to parents and

consumers, creating a relationship of trust with its consumers.  In great detail, Nestlé

demonstrates both its understanding of consumers' concerns with respect to food safety and its

purported intolerance for deviation from very high standards in this regard:

> The Importance of Food Safety.  Food safety is one of the most
> important and constant preoccupation for Nestlé researchers. Since
> the earliest times, the safety of food has been a fundamental
> concern for mankind. Indeed, *food safety is non-negotiable*
> *prerequisite to Nestlé's position as a leading food, nutrition,*
> *health and wellness company*.
>     *    \*       \*      \**
> To meet the challenge, Nestlé has an integrated program of
> systems and measures, which contribute to guaranteeing the safety
> of Nestlé foods:
> • Our worldwide network of experts in the Nestlé R&D system,
> with the Nestlé Research Center as "scientific heart", keeps
> scientists in close contact with each other as well as with the
> various markets to optimize knowledge sharing and anticipating
> emerging issues.
> • Focussed scientific expertise in the key areas of food safety:
> analytical method development and science-based risk assessment.
> • Nestlé's integrated "farm-to-fork" approach puts increasing
> emphasis on traceability and processing.
> • Well-defined procedures for rapid reaction in case a safety issue
> of any kind arises.
> Through these activities, Nestlé scientists make an invaluable
> contribution to guaranteeing continued consumer trust for Nestlé
> products.

Nestlé, *http://www.research.Nestlé.com/about_us/Role_responsibility/Safety_.htm* (last visited

Dec. 28, 2008).  In addition, Nestlé reaffirmed its commitment to safety and wellness with

respect to infant and child products specifically and directly in areas affected by BPA exposure:

"We are also interested in early stage developments relating to … product safety and quality...."

Nestlé, *http://www.research.Nestlé.com/OpenInnovations/* (last visited Dec. 28, 2008).

Nevertheless, Nestlé's reaction to international awareness of the risks of harmful effects of BPA associated with use of its Contaminated Formula Products continues to deny the import of research accepted by U.S. and Canadian government agencies, and Nestlé continues to claim the safety of its Contaminated Formula Products despite hundreds of studies to the contrary.

69.     On its website, Defendant further heralds "[q]uality.  We are dedicated to continuous improvement in the food safety and quality of every product we make and in every activity we perform." Nestlé  Statement on Core Values.  (available at

*http://www.Nestléusa.com/PubAbout/NestléAtGlance.aspx* (last visited Dec. 29, 2008)).

70.     Nestlé's packaging similarly touts the healthfulness of its Contaminated Formula Products.  Its slogan, "Start Healthy, Stay Healthy," offers consumers a guarantee with respect to its products.  Nestlé also confirms its purported commitment to health and wellness and the constancy of its review of its products in this regard, including its Contaminated Formula Products, on its website.

> At Nestlé, we continuously innovate and renovate products to meet consumer needs for health and wellness. As Nestlé is evolving into a Nutrition, Health and Wellness company, we believe that research is essential to make the best quality products that offer specific health and nutritional benefits.
> ***Nestlé's philosophy is to build an open R&D system, consumer-centric and science driven, in order to increase the speed and the impact of our innovation efforts.*** Therefore we are looking for new technologies and products at all stages of development, and we are always open to new and innovative ideas.

Nestlé, *http://www.research.Nestlé.com/OpenInnovations/* (last visited Dec. 28, 2008).  Despite this commitment, Nestlé did not acknowledge or accept the viability of studies with respect to leaching from its Contaminated Formula Products.  The potentially devastating effects of BPA

on infants and children are not mentioned or disclosed anywhere in Nestlé's statements to the public.

71.     Nestlé also emphasizes the superiority of its Contaminated Formula Products. "Nestlé research and development creates high quality infant formula products for use … that is specifically nutritionally adapted. Nestlé also offers superior complementary (weaning) foods." Nestlé Code of Business Conduct at 9 (available at

*http://www.Nestlé.com/Resource.axd?Id=70014B84-A4FC-4F82-BFA0-23939DC52E9D* (last visited Dec. 28, 2008))

72.     Nestlé's representations throughout the relevant period both captured the substance of consumers' concerns and offered reassurance of Nestlé's integrity in this regard.

> What does Nestlé's commitment to nutrition health and wellness mean?  Food has entered a new phase …. Today's consumer is looking for something more - an improved nutritional value. We aim to be able to give consumers the products they need for a healthy lifestyle.… ***We inform fully about the ingredients of our products to allow you to take the decisions necessary to live a wellness lifestyle as you wish.***

Nestlé, *http://www.Nestlé.com/AllAbout/FAQs/CurrentIssues/FAQs.htm* (last visited Dec. 28, 2008).  Thus, Nestlé specifically markets its Contaminated Formula Products to parents and consumers it knows, or should know, are particularly sensitive to health concerns and would not knowingly buy Contaminated Formula Products that place their children at risk for developmental, neural, and reproductive problems.

73.     To make matters worse, Nestlé continued to promote use of its products in ways that exacerbate the dangers of BPA exposure, including disregard that BPA leaching is accelerated by heat.  Indeed, according to Dr. vom Saal, a leading expert on BPA, the fact that BPA would break down and leach out of the plastics under heat conditions is so self-evident that

any college chemistry student examining BPA's molecular structure would easily understand that the molecule would break down under increased temperatures.

74. In addition to making these representations, Defendant also designed its marketing to create a relationship of trust and safety with its consumers. Nestlé warrants that consumers can trust products bearing its name:

> NESTLÉ® and GERBER®. Two names you can trust - joining together for the nutrition of your little ones. Now when you browse the START HEALTHY, STAY HEALTHY™ Resource Center, you'll see two brands many mothers turn to for the health and nutrition of their babies - NESTLÉ® GOOD START® and GERBER®. Two trusted names that are helping to lay the foundation for a lifetime of healthy independent eating.

In addition, on its website, Defendant claims that "*Nestlé recognizes that its consumers have a sincere and legitimate interest in the behavior, beliefs and actions of the Company behind brands in which they place their trust,* and that without its consumers the Company would not exist." Nestlé, *http://www.Nestle.com/AllAbout/AllAboutNestle.htm* (last visited Dec. 29, 2008). Nestlé sets forth Business Principles that suggest a commitment to consumer safety and commits to their adherence globally: "Nestlé does not favor short-term profit at the expense of successful long-term business development." Nestlé, http://www.Nestle.com/AllAbout/AllAboutNestle.htm (last visited Dec. 29, 2008). In representations to consumers, Nestlé relies upon its trust relationship with consumers to assuage their concerns even while continuing to fail to disclose attendant dangers in their Contaminated Formula Products: "Nestlé is conscious of the fact that the success of a corporation is a reflection of the … conduct and the responsible attitude of its management and employees." Nestlé, *http://www.Nestle.com/AllAbout/AllAboutNestle.htm* (last visited Dec. 29, 2008).

### (2)    Failure To Disclose

75.     Despite the foregoing, including Defendant's representations that its Contaminated Formula Products are safe and designed to support healthy growth and development, Nestlé consistently failed to disclose or adequately disclose the dangers of BPA exposure to consumers.  Significantly, Defendant was aware of, but failed to disclose or adequately disclose the following material facts, *inter alia*: (1) that its Contaminated Formula Products contained BPA; (2) that numerous scientific studies performed by, among others, government scientists and university laboratories, found health concerns associated with BPA; (3) that BPA leaching is accelerated by heat; and (4) that the industry studies that were provided to the FDA by the chemical companies that manufacture BPA, and upon which Defendant relies in representing that BPA is safe, are flawed and were the result of a process that was riddled with conflicts of interest.  Moreover, Defendant made its misrepresentations and failed to disclose these material facts in the context of a relationship of trust, which it likewise deceptively promoted.

76.     Incredibly, Defendant nowhere mentions or discloses the danger of BPA exposure.  Nor does it include warnings or information about BPA on its Contaminated Formula Products or the packaging.  The goal of Defendant's conduct is clear – to keep parents and consumers ignorant of the potential dangers of BPA exposure.  Surprisingly, and despite its failure to disclose the dangers of its Contaminated Formula Products to consumers even now, Nestlé markets its commitment to responsible advertising and marketing to consumers: "Nestlé is a founding member of the International Association of Infant Food Manufacturers (IFM), which was formed to …encourage responsible marketing standards for the infant food industry." Nestlé Code of Business Conduct at 9 (available at

*http://www.Nestle.com/Resource.axd?Id=70014B84-A4FC-4F82-BFA0-23939DC52E9D* (last

visited Dec. 28, 2008)).  Even as Nestlé pursued its strategy of marketing its Contaminated

Formula Products to new parents, caregivers and other consumers, it was aware that its

advertising concealed information that was material to consumers' purchasing decisions and that

its representations lulled consumers into a false sense of safety.  In addition, Nestlé knew that its

marketing was false and deceptive in claiming its Contaminated Formula Products were safe and

healthful.

77.     Even today, despite the numerous studies (described above) to the contrary,

Nestlé continues to claim that there are no credible scientific studies that demonstrate that BPA

leaches from its Contaminated Formula Products.

78.     The studies and papers discussed above, as well as many other studies not

mentioned here, have been widely reported, and Defendant therefore cannot state that it is

unaware or has not appreciated the risks of injury these products present.  In addition, Nestlé

conducts its own research as to the effects of its products on infants and children and should

know of the harmful effects of its Contaminated Formula Products.  Nestlé acknowledges that it

"carries out research and development aimed at the constant improvement of infant formula

products…." Nestlé Code of Business Conduct at 9 (available at

*http://www.Nestlé.com/Resource.axd? Id=70014B84-A4FC-4F82-BFA0-23939DC52E9D* (last

visited Dec. 28, 2008)).  Nestlé markets its commitment to research-based decisionmaking and

consumers reasonably believe Nestlé would disclose research-based data demonstrating harmful

health effects or other dangers associates with Defendant's Contaminated Formula Products.

"Research is a key part of our heritage at Nestlé and an essential element our future. We know

there is still much to discover about health, wellness and the role of food in our lives, and we

continue to search for answers to bring consumers Good Food for Good Life." Nestlé,

*http://www.research.Nestlé.com /tools/mission_statement.html* (last visited Dec. 28, 2008)

79.      In addition, and despite over 100 studies and ten years of cumulative data,

Defendant continues to maintain the following specifically with reference to BPA,

> What is Gerber/Nestlé Nutrition doing to address the BPA issue?
>           ….We understand… that some parents may be concerned or
> confused about bisphenol A (BPA).    We are closely monitoring the
> science on BPA, and take very seriously any new scientific evidence.
> While our products are completely safe and compliant with
> regulations, for those products that currently contain BPA, we will
> proactively continue to work with authorities and our suppliers to
> investigate alternatives to using BPA.[53]

80.      Moreover, as indicated above, Nestlé is aware that there are alternative means for

manufacturing its Contaminated Formula Products without using BPA, as is evidenced by the

fact that there are liquid infant formula and other consumer products packaged in metal cans

without the use of BPA.  Nestlé has nevertheless continued to use the toxic chemical BPA in its

infant formula can liners.  To increase profits, Defendant continues to manufacture and market

these Contaminated Formula Products that contain BPA without full disclosure of their risks.

Indeed, infant formula is a $13 billion industry.   *See* Euromonitor Market data for 2007.

Nestlé's position is consistent with its vested interest in ensuring that its share of profits derived

from the continued manufacture and sale of BPA, which generates chemical industry revenues

amounting to $6 million per day (in the U.S., Europe, and Japan alone), is not curtailed or

reduced. Elvira Greiner, Thomas Kaolin and Coro Told, SRI Consulting, *Chemical Economics*

*Handbook Report; Bisphenol A,* February 2001.

81.      Having held itself out as a trustworthy source of safe and healthy baby formula

products, Nestlé had a duty to disclose facts regarding the health risks that their Contaminated

---

[53] http://www.gerber.com/faq?catid=5225

Formula Products posed, including that its Contaminated Formula Products contained BPA that would leach into food and beverages through the course of normal, everyday use, and the serious health risks posed by such BPA exposure. Nestlé has misrepresented and failed to disclose the risks of harm associated with its Contaminated Formula Products and has failed to make honest disclosures to Plaintiffs and other Class members. Plaintiffs and other Class members relied upon Nestlé's misrepresentations and lack of disclosure and have sustained injuries as a result thereof.

### (3) Equitable Estoppel and Equitable Tolling of the Statute of Limitations

82. By virtue of its false statements, misrepresentations and omissions, Defendant actively misled the Class members concerning their legal rights and thus prevented the Class members from enforcing their legal rights.

83. Accordingly, Defendant should be estopped from relying upon any delay by the Class members in enforcing their rights under the law, if any, and all applicable statutes of limitations on the Class members' claims should be equitably tolled.

## V. CLASS ACTION ALLEGATIONS

84. Plaintiffs bring this class action claim pursuant to Rule 23 of the Federal Rules of Civil Procedure. The requirements of Rule 23 are met with respect to the classes defined below.

### A. The Classes.

85. Plaintiffs brings their claim on their own behalf, and on behalf of the following classes:

> All persons in the United States who purchased Contaminated Formula Products containing the industrial chemical Bisphenol-A that were produced, manufactured, distributed, and/or sold by Defendant and who were accordingly damaged thereby, and/or such subclasses as the Court may deem appropriate.

All persons who, in the Consumer Protection States,[54] purchased Contaminated Formula Products containing the industrial chemical Bisphenol-A that were produced, manufactured, distributed, and/or sold by Defendant and who were accordingly damaged thereby (the "Consumer Fraud Class"), and/or such subclasses as the Court may deem appropriate.

All persons who, in the Non-Privity Breach of Express Warranty States,[55] purchased Contaminated Formula Products containing the industrial chemical Bisphenol-A that were produced, manufactured, distributed, and/or sold by Defendant and who were accordingly damaged thereby (the "Breach of Express Warranty Class"), and/or such subclasses as the Court may deem appropriate.

All persons who, in the Non-Privity Breach of Implied Warranty States,[56] purchased Contaminated Formula Products containing the industrial chemical Bisphenol-A that were produced, manufactured, distributed, and/or sold by Defendant and who were accordingly damaged thereby (the "Breach of Implied Warranty Class"), and/or such subclasses as the Court may deem appropriate.

86.     Plaintiffs reserve the right to amend or modify their Complaint and/or the Plaintiff Class definition in connection with meaningful discovery and/or a Motion for Class Certification.

87.     Members of the Class are so numerous and geographically dispersed that joinder of all Class members is impracticable. The Class, upon information and belief, includes

---

[54] The Consumer Protection States are defined hereinafter to include only the states of Alaska, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Vermont, Washington, West Virginia, Wisconsin, and Wyoming.

[55] The Non-Privity Breach of Express Warranty States are defined hereinafter to include only the states of Arkansas, Arizona, California, Colorado, Connecticut, District of Columbia, Hawaii, Indiana, Kansas, Louisiana, Maine, Massachusetts, Minnesota, Montana, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Washington, West Virginia, or Wyoming, which do not require privity.

[56] The Non-Privity Breach of Implied Warranty States are defined hereinafter to include only the states of Arkansas, Colorado, Delaware, District of Columbia, Hawaii, Indiana, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, North

thousands if not hundreds of thousands of individuals geographically dispersed throughout the United States.  The precise number and identities of Class members are unknown to Plaintiffs but can be easily obtained through notice and discovery.  Indeed, notice can be provided through a variety of means including publication, the cost of which is properly imposed upon Defendant.

88.     Plaintiffs will fairly and adequately protect the interests of all Class members and have retained counsel competent and experienced in class and consumer litigation.

89.     Plaintiffs' claims are typical of the claims of the Class and all Class members sustained uniform damages arising out of the conduct challenged in this action.  The Class is ascertainable and there is a well-defined community of interests in the questions of law and/or fact alleged since the rights of each Class member were infringed or violated in a similar fashion based upon the Defendant's wrongdoing.  The injuries sustained by the Plaintiffs and the Class members flow, in each instance, from a common nucleus of operative facts – the Defendant's wrongdoing.  In every related case, Plaintiffs and Class members suffered uniform damages caused by their purchase of Contaminated Formula Products produced, manufactured, distributed, and/or sold by Defendant.

90.     Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the use of BPA in Defendant's Contaminated Formula Products.

91.     In addition, there are questions of law and fact common to the Class that predominate over any questions solely affecting individual Class members.  Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs

---

Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, or Wyoming, which do not require privity.

and the Class members. Individual questions, if any, pale by comparison to the numerous

common questions that predominate. Such common questions include but are not limited to:

a. Whether Defendant represented to consumers that its Contaminated Formula Products were safe to use for their intended purpose or omitted material risks associated with the use of its Contaminated Formula Products;

b. Whether California law applies to the nationwide class;

c. Whether Defendant violated applicable consumer protection statutes;

d. Whether Defendant violated express and/or implied warranties;

e. Whether Defendant negligently misrepresented or omitted characteristics of their Contaminated Formula Products;

f. Whether Defendant intentionally or fraudulently misrepresented or omitted characteristics of their Contaminated Formula Products;

g. Whether Defendant was unjustly enriched; and

h. Whether Plaintiffs and the Class were harmed and, if so, to what relief they are entitled.

92.     A class action is superior to other available methods for the fair and efficient

adjudication of this controversy because joinder of all Class members is impracticable.

Furthermore, the expense and burden of individual litigation make it impossible for the Class

members to individually redress the wrongs done to them.

## VI.     CAUSES OF ACTION

### COUNT I:  Violation Of Cal. Bus. & Prof. Code §17200, *et seq.*

93.     Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

94.     California Business and Professions Code §17200 (or "UCL") prohibits any

"unfair, deceptive, untrue or misleading advertising."  For the reasons set forth above, Defendant

engaged in unfair, deceptive, untrue and misleading advertising in violation of California

Business and Professions Code §17200, in that Defendant's representations and advertising were likely to deceive the public as to the safety and quality of the Contaminated Formula Products .

95.     California Business and Professions Code §17200 also prohibits any "unlawful business act or practice."  Defendant has engaged in "unlawful" business acts and practices by selling, marketing and distributing its Contaminated Formula Products  as safe, quality and age-appropriate products when in fact the Contaminated Formula Products  were packaged in containers covered in the chemical BPA.

96.     In the conduct of trade or commerce regarding its production, marketing and sale of Contaminated Formula Products , Defendant engaged in one or more unfair or deceptive acts or practices, including but not limited to failing to disclose or adequately disclose the following material facts, *inter alia*: (1) that its Contaminated Formula Products contained BPA; (2) that numerous scientific studies performed by, among others, government scientists and university laboratories, found health concerns associated with BPA; (3) that BPA leaching is accelerated by heat; and (4) that the industry studies that were provided to the FDA by the chemical companies that manufacture BPA, and upon which Defendant relies in representing that BPA is safe, are flawed.

97.     These business acts and practices violated numerous provisions of federal law, including, *inter alia*; the Consumer Product Safety Commission statutes and regulations, 15 U.S.C. §2051 *et seq.* (Consumer Product Safety Act); 16 C.F.R. §1500.18(a)(2) (Banned toys and other banned articles intended for use by children); Proposition 65, Cal. Health & Safety Code §§25249.6, *et seq*. (Required warning before exposure to chemicals known to cause cancer or respiratory toxicity); California Consumer Legal Remedies Act, Cal. Civ. Code §§1750 *et seq*.; as well as other violations of state law and common law.  Plaintiffs reserve the right to

identify additional provisions of the law violated by Defendant as further investigation and discovery warrants.

98.     Defendant's failure to comply with the above statutes, regulations, and common law constitutes an unlawful business act or practice.

99.     Defendant's wrongful conduct emanated, and continues to emanate, from California.  Specifically, Nestlé, USA is headquartered in Glendale, California and its executives are located in California. Likewise, Nestlé operates not only executive level operations in California, but also manufacturing centers and sales offices are located within California as well. The products at issue, and the marketing of those products, were designed, directed and controlled from California. Likewise, many of the Contaminated Formula Products were purchased in stores and on websites located in California.  Thus, application of the UCL on a nationwide basis to Nestlé 's conduct is entirely appropriate.

100.    Plaintiffs and members of the Class have reasonably acted and relied on the misrepresentations made by Defendant regarding Defendant's assurances that the Contaminated Formula Products are safe and quality products, and Plaintiffs have suffered injury as a direct result of the unlawful business practices of the Defendant.

101.    California Business and Professions Code §17200 also prohibits any "unfair business act or practice." Through the above-described conduct, Defendant engaged in "unfair" business acts or practices and Defendant's conduct outweighs any business justification, motive or reason, particularly considering the available legal alternatives that exist in the marketplace. Further, the Defendant's conduct is immoral, unethical, unscrupulous, offends established public policy and has injured Plaintiffs and other members of the Class.

- 38 -

102.     California Business and Professions Code §17200 also prohibits any "fraudulent business act or practice."  By engaging in the above-described conduct, the Defendant engaged in "fraudulent" business acts or practices in that the business acts and practices described above had a tendency and likelihood to deceive persons to whom such conduct was and is targeted by selling, marketing and distributing the Contaminated Formula Products as safe and quality products when in fact the Contaminated Formula Products contained hazardous BPA.

103.     Plaintiffs and members of the Class relied on Defendant's representations that the Contaminated Formula Products were safe to feed to infants.

104.     Plaintiffs and members of the Class were reasonably deceived by Defendant's representations that the products were safe and suitable for use, when in fact they were contaminated with lead, lead paint or contained small magnets that could become loose and cause intestinal perforation or blockage, which can be fatal.  Plaintiffs and members of the Class would not have purchased the Contaminated Formula Products had they known of the risks and hazards associated with BPA.

105.     As a direct and proximate result of Defendant's misrepresentations and omissions regarding the safety of the Contaminated Formula Products, Plaintiffs and members of the Class have suffered damages.  Specifically, as a result of the defects, Plaintiffs and members of the Class, among other things, have purchased products that are not fit for their ordinary use as children's formula, have suffered an increase risk of serious health problems, and incurred the cost of diagnostic screening.

106.     Defendant has thus engaged in unlawful, unfair and fraudulent business acts and practices and false advertising, entitling Plaintiffs to judgment and equitable relief against Defendant, as set forth in the Prayer for Relief.

107.     Additionally, pursuant to California Business & Professions Code §17203,

Plaintiffs seek an order requiring Defendant to immediately cease such acts of unlawful, unfair

and fraudulent business practices.

## COUNT II: Violations Of The CLRA

108.     Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

109.     The California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750,

*et seq.*, protects consumers against fraud, unlawful practices, and unconscionable commercial

practices in connection with the sale of any merchandise.  Plaintiffs are consumers as defined by

California Civil Code §1761(d).  The Contaminated Formula Products are goods within the

meaning of the California Consumers Legal Remedies Act.

110.     Defendants sold and falsely marketed the Contaminated Formula Products as safe

and quality products, when in fact the Contaminated Formula Products were laden with BPA

which is hazardous substance and thus violates the California Consumers Legal Remedies Act.

Defendant's representations were likely to deceive consumers.

111.     Defendant violated and continues to violate, the Consumer Legal Remedies Act

by engaging in the following practices proscribed by California Civil Code §1770(a) in

transactions with Plaintiffs and the Class which were intended to result in, and did result in, the

sale of the Contaminated Formula Products laced with BPA:

(5) Representing that [the Contaminated Formula Products

have] . . . characteristics . . . uses [or] benefits . . . which they do not have. . . .

(7) Representing that [the Contaminated Formula Products] are of a particular

standard, quality or grade…if they are of another.

(9) Advertising goods…with intent not to sell them as advertised.

(16) Representing that [the Contaminated Formula Products have] been supplied in accordance with a previous representation when [they have] not.

112. Plaintiffs and other members of the Class reasonably relied upon Defendants' representations that the Contaminated Formula Products were safe to be consumed by infants

113. Plaintiffs and other members of the Class were reasonably deceived by Defendant's representations that the Contaminated Formula Products were safe when instead they were unsafe and exposed children to hazardous BPA. Plaintiffs and other Class members would not have purchased the Contaminated Formula Products if they had been made aware of the dangers of BPA.

114. As a direct and proximate result of Defendant's misrepresentations and unlawful and unconscionable commercial practices, Plaintiffs and members of the Class have paid for products that are unsuitable for their ordinary use as formula for infants, have suffered an increased risk of serious health problems and incurred the cost of diagnostic screening.

115. Defendant's wrongful conduct emanated, and continues to emanate, from California. Specifically, Nestlé, USA is headquartered in Glendale, California and its executives are located in California. Likewise, Nestlé operates not only executive level operations in California, but also manufacturing centers and sales offices are located within California as well. The products at issue, and the marketing of those products, were designed, directed and controlled from California. Likewise, many of the Contaminated Formula Products were purchased in stores and on websites located in California. Thus, application of the CLRA on a nationwide basis to Nestlé 's conduct is entirely appropriate.

116. Pursuant to §1782 of the Consumers Legal Remedies Act, Plaintiffs notified Defendant in writing by certified mail of the particular violations of §1770 of the Act and

demanded that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of its intent to so act.

117.    As 30 days have elapsed since Plaintiffs provided such notice, Plaintiffs and the Class are entitled to damages under the Consumer Legal Remedies Act, California Civil Code §1784.

118.    Pursuant to California Civil Code §1782(d), Plaintiffs and the Class seek a Court order enjoining the above-described wrongful acts and practices of Defendant and for restitution and disgorgement.

**COUNT III : Violation of State Consumer Protection Laws**

119.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.  Each of these Plaintiffs brings this Count on his/her own behalf under the law of the state in which he/she purchased Contaminated Formula Products produced by Defendant on behalf of: (a) all other persons who purchased Contaminated Formula Products produced by Defendant in the same state as Plaintiffs purchased such products; and (b) all other persons who purchased such products in states having similar consumer protection laws.

120.    Each Plaintiff and member of the Class is a consumer, purchaser or other person entitled to the protection of the consumer protection laws of the state in which he or she purchased the Contaminated Formula Products produced by Defendant.

121.    The consumer protection laws of the state in which each Plaintiff and member of the Class purchased the Contaminated Formula Products declares that unfair or deceptive acts or practices in the conduct of trade or commerce are unlawful.

122.    Thirty-seven states and the District of Columbia have enacted statutes designed to protect consumers against unfair, deceptive, fraudulent and unconscionable trade and business

practices and false advertising and that allow consumers to bring private and/or class actions.

These statutes are found at:

i. Alaska Unfair Trade Practices and Consumer Protection Act, Ak. Code § 45.50.471, *et seq.*;

j. Arkansas Deceptive Trade Practices Act, Ark. Code § 4-88-101, *et seq.*;

k. California Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and California's Unfair Competition Law, Cal. Bus. & Prof Code § 17200, *et seq.*;

l. Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101, *et seq.*;

m. Connecticut Unfair Trade Practices Act, Conn. Gen. Stat § 42-110a, *et seq.*;

n. Delaware Deceptive Trade Practices Act, 6 Del. Code § 2511, *et seq.*;

o. District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28 3901, *et seq.*;

p. Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. Ann. § 501.201, *et seq.*;

q. Georgia  Fair Business Practices Act, §10-1-390 *et seq.*;

r. Hawaii Unfair and Deceptive Practices Act, Hawaii Revised Statues § 480 1, *et. seq.*, and Hawaii Uniform Deceptive Trade Practices Act, Hawaii Revised Statutes § 481A-1, *et seq.*;

s. Idaho Consumer Protection Act, Idaho Code § 48-601, *et seq.*;

t. Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.*;

u. Kansas Consumer Protection Act, Kan. Stat. Ann §§ 50 626, *et seq.*;

v. Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq.*, and the Kentucky Unfair Trade Practices Act, Ky. Rev. Stat. Ann §§ 365.020, *et seq.*;

w.    Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. Ann. §§ 51:1401, *et seq.*;

x.    Maine Unfair Trade Practices Act, 5 Me. Rev. Stat. § 205A, *et seq.*, and Maine Uniform Deceptive Trade Practices Act, Me. Rev. Stat. Ann. 10, § 1211, *et seq.*,

y.    Maryland Consumer Protection Act, Md. Com. Law Code § 13-101, *et seq.*;

z.    Massachusetts Unfair and Deceptive Practices Act, Mass. Gen. Laws ch. 93A;

aa.    Michigan Consumer Protection Act, §§ 445.901, *et seq.*;

bb.    Minnesota Prevention of Consumer Fraud Act, Minn. Stat §§ 325F.68, *et seq.*; and Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, *et seq.*;

cc.    Mississippi Consumer Protection Act, Miss. Code Ann. §§ 75-24-1, *et seq.*;

dd.    Missouri Merchandising Practices Act, Mo. Rev. Stat. § 407.010, *et seq.*;

ee.    Montana Unfair Trade Practices and Consumer Protection Act, Mont. Code §30-14-101, *et seq.*;

ff.    Nebraska Consumer Protection Act, Neb. Rev. Stat. §59 1601, *et seq.*, and the Nebraska Uniform Deceptive Trade Practices Act, Neb. Rev. Stat. § 87-301, *et seq.*;

gg.    Nevada Trade Regulation and Practices Act, Nev. Rev. Stat. §§ 598.0903, *et seq.*;

hh.    New Hampshire Consumer Protection Act,  N.H. Rev. Stat. § 358-A:1, *et seq.*;

ii.    New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8 1, *et seq.*;

jj.    New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57 12 1, *et seq.*;

kk.    New York Deceptive Acts and Practices Act, N.Y. Gen. Bus. Law §§ 349, *et seq.*;

ll.   North Dakota Consumer Fraud Act, N.D. Cent. Code §§ 51 15 01, *et seq.*;

mm.   Oklahoma Consumer Protection Act, Okla. Stat. 15 § 751, *et seq.*;

nn.   Oregon Unfair Trade Practices Act, Rev. Stat § 646.605, *et seq.*;

oo.   Rhode Island Unfair Trade Practices And Consumer Protection Act, R.I. Gen. Laws § 6-13.1-1, *et seq.*;

pp.   South Carolina Unfair Trade Practices Act, S.C. Code Laws § 39-5-10, *et seq.*;

qq.   South Dakota's Deceptive Trade Practices and Consumer Protection Law, S.D. Codified Laws §§ 37 24 1, *et seq.*;

oo.   Vermont Consumer Fraud Act, Vt. Stat. Ann. tit.9, § 2451, *et seq.*;

ss.   Washington Consumer Fraud Act, Wash. Rev. Code § 19.86.010, *et seq.*;

tt.   West Virginia Consumer Credit and Protection Act, West Virginia Code § 46A-6-101, *et seq.*;

uu.   Wisconsin Deceptive Trade Practices Act, Wis. Stat. §§ 100.18, *et seq.*

123.   The Contaminated Formula Products produced by Defendant constitutes products to which these consumer protection laws apply.

124.   In the conduct of trade or commerce regarding its production, marketing and sale of Contaminated Formula Products, Defendant engaged in one or more unfair or deceptive acts or practices, including but not limited to failing to disclose or adequately disclose the following material facts, inter alia: (1) that its Contaminated Formula Products contained BPA; (2) that numerous scientific studies performed by, among others, government scientists and university laboratories, found health concerns associated with BPA; (3) that BPA leaching is accelerated by heat; and (4) that the industry studies that were provided to the FDA by the chemical companies that manufacture BPA, and upon which Defendant relies in representing that BPA is safe, are flawed.

125. Defendant's labeling, statements, advertisements, representations and omissions were deceptive and/or likely to deceive.

126. Defendant knew or should have known that its statements, advertisements, representations and omissions were false, untrue and misleading.

127. Defendant used or employed such deceptive and unlawful acts or practices with the intent that these Plaintiffs and members of the Class rely thereon.

128. Plaintiffs and the other members of the Class did so rely.

129. Each Plaintiff and member of the Class purchased Contaminated Formula Products produced by Defendant who falsely represented the healthiness and safety of the Contaminated Formula Products. Plaintiffs and members of the Class would not have purchased the Contaminated Formula Products but for the deceptive and unlawful acts of Defendant.

130. As a result of Defendant's conduct, Plaintiffs and members of the Class were damaged.

131. Defendant's conduct showed complete indifference to or conscious disregard for the rights and safety of others such that an award of punitive and/or statutory damages is appropriate

## COUNT III: Breach of Express Warranty

132. Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein. Each of the Plaintiffs brings this Count on his/her own behalf under the law of the state in which he/she purchased Contaminated Formula Products produced by Defendant on behalf of: (a) all other persons who purchased Contaminated Formula Products produced by Defendant in the same state; and (b) all other persons who purchased such products in states having similar laws regarding express warranty.

133.     Defendant's representation that the Contaminated Formula Products are safe and healthy is an affirmation by Defendant that the Contaminated Formula Products are safe, healthy and generally fit for human use. In fact, Defendant's sale of the Contaminated Formula Products itself is a representation that it believes that they are safe for use.

134.     Defendant's representations and insinuations regarding the fitness and safety of the Contaminated Formula Products are made to Plaintiffs and members of the Class at the point of purchase, are part of the description of the goods and the bargain upon which they are offered for sale and purchased by Plaintiffs and members of the Class.

135.     In addition or in the alternative, Defendant's representations are made to induce Plaintiffs and members of the Class to rely on such representations, and Plaintiffs and members of the Class did so rely on said representations as a material factor in his/her decision to purchase the Contaminated Formula Products. Plaintiffs and the members of the Class would not have purchased the Contaminated Formula Products but for these representations and warranties.

136.     The Contaminated Formula Products produced by Defendant did not, in fact, meet with descriptions Defendant made about the health benefits and safety of the products.

137.     At all times relevant to this action, Defendant falsely represented its Contaminated Formula Products were fit for human use when they were not, and falsely represented the other characteristics of the Contaminated Formula Products in breach of these express warranties.

138.     At all times relevant to this action, Defendant made false representations in breach of its express warranties and in violation of state express warranty laws, including:

a.     Ak. St. § 42.02.313.

b.     Ariz. Rev. Stat. Ann. § 47-2313.

c.     Ark. Code Ann. § 4-2-313.

d.      California Commercial Code § 2313.

e.      Colo. Rev. St. § 4-2-313.

f.      Conn. Gen. Stat. Ann. § 42a-2-313.

g.      D.C. Stat. § 28:2-313.

h.      Haw. Rev. Stat. § 490:2-313.

i.      Ind. Code § 26-1-2-313.

j.      Kansas Stat. Ann. § 84-2-313.

k.      La. Civ. Code. Ann. Art. 2520

l.      11 Maine Rev. Stat. Ann. § 2-313.

m.      Mass. Gen. Laws Ann. 106 § 2-313.

n.      Minn. Stat. Ann. § 336.2-313.

o.      Miss. Code Ann. § 75-2-313.

p.      Missouri Rev. Stat. §400.2-313.

q.      Mont. Code Ann. 30-2-313.

r.      Neb. Rev. Stat. § 2-313.

s.      Nev. Rev. Stat. §104.2313.

t.      N.H. Rev. Stat. § 382-A:2-313.

u.      N.J. Stat. Ann. 12A:2-313.

v.      N.M. Stat. Ann. § 55-2-313.

w.      N.Y. U.C.C. Law § 2-313.

x.      N.C. Gen. Stat. Ann. § 25-2-313.

y.      Okla. Stat. Ann. Tit. 12A, § 2-313.

z.      Or. Rev. Stat. § 72.3130.

aa.      Pa. Stat. Ann. Tit. 13, § 2313.

bb.      R.I. Stat. § 6A-2-313.

cc.      S.C. § 36-2-313.

dd.      S.D. Cod. Laws. § 57A-2-313.

ee.      Tenn. Code Ann. § 47-2-313.

ff.      Tex. Bus. & Com. Code Ann. § 2.313.

gg.      Ut. Code Ann. § 70A-2-313.

hh.      Vt. Stat. Ann. § 2-313.

ii.      Wa. Ann. 62A.2-313.

jj.      W. Va. Code § 46-2-313.

kk.     Wyo. Stat. 34.1-2-313.

139.    The above statutes do not require privity of contract in order to recover for breach of express warranty.

140.    As a result of Defendant's conduct, Plaintiffs and members of the Class were damaged, have suffered injury in fact and have lost money and/or property.

141.    Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of themselves and members of the Class, placed Defendant on notice thereof.

**COUNT IV:  Breach of Implied Warranty of**
**Merchantability and Fitness for a Particular Purpose**

142.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.  Each of the Plaintiffs brings this Count on his/her own behalf under the law of the state in which he/she purchased Contaminated Formula Products produced by Defendant on behalf of: (a) all other persons who purchased Contaminated Formula Products produced by Defendant in the same state; and (b) all other persons who purchased such products in states having similar laws regarding implied warranties of merchantability and fitness for a particular purpose.

143.    Plaintiffs and members of the Class purchased Contaminated Formula Products produced by Defendant for the ordinary purposes of Contaminated Formula Products, assuming that it was, in fact, safe to consume them.  Plaintiffs and the members of the Class relied on Defendant's skill and judgment to select and furnish suitable goods for that purpose.

144.    Defendant held itself out as possessing, and did, possess expertise, skill and knowledge superior to consumers including Plaintiffs and members of the Class, who had a right to rely thereon.

145.    By marketing the Contaminated Formula Products for sale, Defendant impliedly warranted that such products were, in fact, safe for ordinary use by children and infants.

146.    By the acts set forth in detail above, Defendant warranted that the Contaminated Formula Products were safe and healthy, but intentionally omitted, suppressed, and withheld material information regarding risks associated with BPA found in its Contaminated Formula Products.  Plaintiffs and the members of the Class bought the Contaminated Formula Products relying on Defendant's skill, judgment and representations.    However, Defendant's Contaminated Formula Products are not free from risk of harmful exposure to BPA, as set forth in detail above.

147.    At the time of the sales, Defendant had reason to know the particular purpose for which its goods were being offered and acquired, and that Plaintiffs and the members of the Class were relying on Defendant's skill and judgment to select and furnish suitable and safe goods for that purpose.  Accordingly, there was an implied warranty that the goods were fit for this purpose.

148.    However, Defendant breached this warranty implied at the time of sale by providing goods that are/were unsuitable for the purpose for which they were made and purchased because the Contaminated Formula Products sold were not free from risk of harmful exposure to BPA.

149.    As such, the Contaminated Formula Products produced and sold by Defendant were not fit for their ordinary purpose.

150.    Defendant's conduct breached its implied warranties regarding the Contaminated

Formula Products sold under state implied warranty laws including:

        a.        Ak. St. § 45.02.314 and § 45.02.315.

        b.        Cal. Comm. Code § 2314.

        c.        Co. Rev. Stat. § 4-2-314 and § 4-2-315.

        d.        6 Del. C. § 2-314 and § 2-315.

        e.        D.C. Stat. § 28:2-314 and § 28:2-315.

        f.        Haw. Rev. Stat. § 490:2-314 and § 490:2-315.

        g.        Ind. Code § 26-1-2-314 and § 26-1-2-315.

        h.        La. Civ. Code Ann. Art. 2524.

        i.        11 Maine Rev. Stat. Ann. § 2-314 and § 2-315.

        j.        Md. Com. Law Code Ann. § 2-314 and § 2-315.

        k.        Mass. Gen. Laws Ann. 106 § 2-314 and § 2-315.

        l.        Mich. Comp. Laws Ann. 440.2314 and 440.2315.

        m.        Minn. Stat. Ann. § 336.2-314 and §336.2-315.

        n.        Miss. Code Ann. § 75-2-314 and § 75-2-315.

        o.        Missouri Rev. Stat. 400.2-314 and 400.2-315.

        p.        Mont. Code Ann. 30-2-314 and 30-2-315.

        q.        Neb. Rev. Stat. § 2-314 and § 2-315.

        r.        Nev. Rev. Stat. 104.2314 and 104.2315.

        s.        N.H. Stat. Ann. § 382-A:2-314 and § 382-A:2-315.

        t.        N.J. Stat. Ann. 12A:2-314 and 12A:2-315.

        u.        N.M. Stat. Ann. § 55-2-314 and § 55-2-315.

        v.        N.D. Stat. 41-02-31 and 41-02-32.

        w.        Ohio Rev. Code Ann. § 1302.27 and § 1302.28.

        x.        Okla. Stat. Ann. tit. 12A, § 2-314 and § 2-315.

        y.        Pa. Stat. Ann. tit. 13, § 2314 and §2315.

        z.        S.C. § 36-2-314 and § 36-2-315.

        aa.        S.D. Cod. Laws. § 57A-2-314 and § 57A-2-315.

        bb.        Tex. Bus. & Com. Code Ann. § 2.314 and § 2.315.

        cc.        Ut. Code Ann. § 70A-2-314 and § 70A-2-315.

        dd.        Va. Code Ann. § 8.2-314 and § 8.2-315.

ee.     W. Va. Code § 46-2-314 and § 46-2-315.

ff.     Wyo. Stat. 34.1-2-314 and 34.1-2-315.

151.    These states do not require privity of contract in order to recover for breach of implied warranty.

152.    As a result of Defendant's breach of their implied warranties, Plaintiffs and members of the Class have been damaged.

153.    Within a reasonable time after they knew or should have known of such breach, Plaintiffs, on behalf of themselves and members of the Class, placed Defendant on notice thereof.

## COUNT V:  Intentional Misrepresentation

154.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.  Each of the Plaintiffs brings this Count on his/her own behalf under the law of the state in which he/she purchased Contaminated Formula Products produced by Defendant on behalf of: (a) all other persons who purchased Contaminated Formula Products produced by Defendant in the same state; and (b) all other persons who purchased such products in states having similar laws regarding intentional misrepresentations.

155.     Defendant has represented to the public, including Plaintiffs, by promoting, marketing, advertising, packaging, labeling and other means or by intentional omission, that its Contaminated Formula Products have the characteristics, ingredients, and qualities that they do not have, specifically, that the Contaminated Formula Products were healthy and safe for use, or have concealed and/or omitted relevant and material facts about the characteristics of those products.

156.    Defendant's misrepresentations and omissions were material.

157.    Defendant's representations were untrue in that the Contaminated Formula Products were not free from risk of harmful exposure to BPA.

158.    At the time Defendant made the representations and omissions herein alleged it knew the representations were false.

159.    Defendant made the omissions and misrepresentations herein alleged with the intention of depriving Plaintiffs and Class members of property or otherwise causing injury, and have committed fraud.

160.    Plaintiffs and others believed and relied on Defendant's uniform omissions, promotions, marketing, advertising, packaging and labeling of the Contaminated Formula Products, and, in justifiable reliance thereon, purchased the Contaminated Formula Products.

161.    As a proximate result of these acts, Plaintiffs and other consumers were induced to purchase products that they would not have purchased but for the misrepresentations and/or omissions and spent an amount to be determined at trial.

162.    Plaintiffs and the Class in purchasing, using, and consuming the Contaminated Formula Products as herein alleged, did rely on Defendant's above representations, all to their detriment.

163.    As a result of Defendant's conduct, Plaintiffs and Class members were damaged and are therefore entitled to compensatory damages, multiple damages, punitive damages and equitable relief.

## COUNT VI:  Negligent Misrepresentation

164.    Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.  Each of the Plaintiffs brings this Count on his/her own behalf under the law of the state in which he/she purchased Contaminated Formula Products produced by Defendant on behalf of: (a) all other persons who purchased Contaminated Formula Products produced by

- 53 -

Defendant in the same state; and (b) all other persons who purchased such products in states having similar laws regarding negligent misrepresentation.

165.    Defendant owed a duty to Plaintiffs and members of the Class to exercise reasonable care in making representations about the health, safety and fitness for use of their Contaminated Formula Products.

166.    Defendant negligently and recklessly made such representations and omitted to disclose material facts to potential customers and the general public through uniform misrepresentations, non-disclosure and concealment through promotion, marketing, advertising, packaging, labeling and other means or by omission by Defendant or at their direction.

167.    Defendant's representations and omissions regarding the safety and health benefits of their plastic bottle products were material.

168.    Defendant's mislabeling, misrepresentations and non-disclosures were intended to influence consumers' purchasing decisions.

169.    Plaintiffs and members of the Class reasonably relied on Defendant's uniform promotion, marketing, advertising, packaging and labeling of its Contaminated Formula Products, which misrepresented and omitted crucial facts and, in justifiable reliance thereon, purchased the Contaminated Formula Products.

170.    Defendant knew or should have known that Plaintiffs and members of the Class relied upon the labeling, representations and omissions of Defendant.

171.    Defendant's representations and omissions regarding the safety and healthiness of its Contaminated Formula Products were false and misleading as alleged above.

172.    As a result of these misrepresentations, omissions and concealment, Plaintiffs and members of the Class have been damaged in an amount to be proven at trial.

173.     As a result of Defendant's conduct, Plaintiffs and Class members were damaged and are therefore entitled to compensatory damages, multiple damages, and equitable relief.

## COUNT VII:  Unjust Enrichment

174.     Plaintiffs incorporate by reference the preceding paragraphs as if they were fully set forth herein.  Each of the Plaintiffs brings this Count on his/her own behalf under the law of the state in which he/she purchased Contaminated Formula Products produced by Defendant on behalf of: (a) all other persons who purchased Contaminated Formula Products produced by Defendant in the same state; and (b) all other persons who purchased such products in states having similar laws regarding unjust enrichment.

175.     Defendant benefited from monies received from the purchases made by Plaintiffs and members of the Class of Contaminated Formula Products produced by Defendant.

176.     Under the circumstances, it would be inequitable for Defendant to retain the above-described benefits.

177.     As a result of Defendant's unjust enrichment, Plaintiffs and members of the Class suffered losses in an amount to be determined at trial and seek full disgorgement and restitution of Defendant's unjust enrichment.

## JURY TRIAL DEMANDED

178.     Plaintiff and the proposed Class demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class members request that the Court enter an order or judgment against Defendant including the following:

A.     Certification of the action as a Class Action pursuant to Rule 23(b)(3) or 23(b)(2) of the Federal Rules of Civil Procedure, and appointment of Plaintiffs as Class Representatives and their counsel of record as Class Counsel;

B.    Damages in the amount of monies paid for Defendant's offending Contaminated Formula Products and/or other consequential or incidental damages;

C.    Actual damages, statutory damages, punitive or treble damages, and such other relief as provided by the statutes cited herein;

D.    Pre-judgment and post-judgment interest on such monetary relief;

E.    Equitable relief in the form of restitution, to restore monies received by Defendant as a result of the unfair, unlawful and/or deceptive conduct alleged herein;

F.    Injunctive relief barring Defendant from continuing its use of BPA in its Contaminated Formula Products in the manner described herein;

G.    The costs of bringing this suit, including reasonable attorneys' fees; and

H.    All other relief to which Plaintiffs and members of the Class may be entitled at law or in equity.

Respectfully Submitted,

**WHATLEY DRAKE & KALLAS, LLC**

By_____*/s/ Edith M. Kallas*_____
Edith M. Kallas
Patrick J. Sheehan
Dominique Day
1540 Broadway, 37th Floor
New York, NY 10036
Telephone: (212) 447-7070
Fax: (212) 447-7077
ekallas@wdklaw.com
psheehan@wdklaw.com
dday@wdklaw.com
**Co-Lead Counsel for Plaintiffs**

**WALTERS BENDER STROHBEHN
& VAUGHAN, P.C.**

By_____*/s/ Thomas V. Bender*_____
Thomas V. Bender, Mo. Bar #28099
2500 City Center Square
1100 Main Street
P.O. Box 26188
Kansas City, MO 64196
Telephone: (816) 421-6620
Fax: (816) 421-4747
tbender@wbsvlaw.com
**Co-Lead Counsel for Plaintiffs**

**HORN, AYLWARD & BANDY, LLC**

By_____*/s/ Joseph A. Kronawitter*_____
Robert A. Horn
Joseph A. Kronawitter
2600 Grand Blvd., Ste. 1100
Kansas City, MO 64108
816-421-0700
Fax: 816-421-0899
rhorn@hab-law.com
jkronawitter@hab-law.com
**Liaison Counsel for Plaintiffs**

- 57 -

**GIRARDI KEESE**

By _____ */s/ Thomas V. Girardi* _____
Thomas V. Girardi
James P. Sizemore
Graham B. LippSmith
1126 Wilshire Blvd.
Los Angeles, CA 90017
Telephone: (213) 977-0211
Fax: (213) 481-1554
**Plaintiffs' Steering Committee**


**HAGENS BERMAN SOBOL
SHAPIRO LLP**

By _____ */s/ Elizabeth A. Fegan* _____
Elizabeth A. Fegan
Daniel J. Kurowski
820 North Blvd., Suite B
Oak Park, Illinois 60301
Telephone: (708) 776-5604
Fax: (708) 776-5601
beth@hbsslaw.com
dank@hbsslaw.com
**Plaintiffs' Steering Committee**


**HODGES LAW FIRM**

By _____ */s/ Michael L. Hodges* _____
Michael L. Hodges
13420 Santa Fe Trail Dr.
Lenexa, KS 66215
Telephone: (913) 888-7100
Fax: (913) 888-7388
mikehodges@hodgeslawfirm.com
**Plaintiffs' Steering Committee**

**KELLER ROHRBACK L.L.P.**

By_____/s/ Lynn Sarko_____
Lynn Sarko
Gretchen Cappio
Laura Gerber
Keller Rohrback L.L.P. Seattle, WA
1201 Third Avenue, Suite 3200
Seattle, Washington 98101-3052
Telephone: (206) 623-1900
Fax: (206) 623-3384
lsarko@kellerrohrback.com
gcappio@kellerrohrback.com
lgerber@kellerrohrback.com
**Plaintiffs' Steering Committee**


**STRANGE & CARPENTER**

By_____/s/ Brian R. Strange_____
Brian R. Strange
Gretchen Carpenter
Strange & Carpenter
12100 Wilshire Boulevard 19th Fl
Los Angeles, CA 90025
Telephone: (310) 207-5055
Fax: (310) 826-3210
bstrange@strangeandcarpenter.com
gcarpenter@strangeandcarpenter.com
**Plaintiffs' Steering Committee**

**THE LAW OFFICES OF ROBERT H. WEISS, PLLC**

By_____/s/ Robert H. Weiss_____
Robert H. Weiss
Stephen Murakami
Marissa Lau
50 Jericho Turnpike, Suite 201
Jericho, New York 11753
Telephone: (516) 876-4213
Fax: (516) 876-6906
roberthw119@msn.com
stephen@robertweisslaw.com
marissa@robertweisslaw.com
**Plaintiffs' Steering Committee**

**ALBERS AND ALBERS**

By_____/s/ James Sugar Albers_____
James Sugar Albers
88 North Fifth Street
Columbus, OH 43215
Telephone: (614) 464-4414
Fax: (614) 464-0604
albers_law@yahoo.com

**BARNOW AND ASSOCIATES, P.C.**

By_____/s/ Ben Barnow_____
Ben Barnow
Sharon Harris
One North LaSalle Street, Suite 4600
Telephone: (312) 621-2000
Fax: (312) 621-2000


**BAUM HEDLUND ARISTEI & GOLDMAN PC**

By_____/s/ Ronald Goldman_____
Ronald Goldman
A. Ilyas Akbari
Roger David Drake
12100 Wilshire Boulevard
Suite 950
Los Angeles, CA 90025
(310) 207-3233
Fax: (310) 820-7444
rgoldman@baumhedlundlaw.com
iakbari@baumhedlundlaw.com
rdrake@baumhedlundlaw.com

**BOLLINGER, RUBERRY AND GARVEY**

By_____/s/ Howard M. Rubenstein_____
Michelle Marie Bracke
500 West Madison Street
Suite 2300
Chicago, IL 60606-2511
(312) 466-8000
michelle.bracke@brg-law.net

- 60 -

**BRANSTETTER, STRANCH AND JENNINGS, PLLC**

By_____/s/ J. Gerard Stranch_____

J Gerard Stranch
James G. Stranch
227 Second Avenue North
Fourth Floor
Nashville, TN 37201
Telephone: (615) 254-8801
gerards@@branstetterlaw.com
jims@branstetterlaw.com


**DRUBNER & HARTLEY**

By_____/s/ James E. Hartley_____
James E. Hartley
500 Chase Parkway
Waterbury, CT 06708
Telephone: (203) 753-9291
Fax: (203) 753-6373
jhart@dholaw.com

**EMERSON POYNTER, LLP**

By_____/s/ John G. Emerson_____
John G. Emerson
Scott E. Poynter
Christopher D. Jennings
Gina M. Cothern
830 Apollo Lane
Houston, TX 77058
Telephone: (281) 488-8854
Fax: (281) 488-8867

**FINKELSTEIN THOMPSON, LLP**

By_____/s/ Burton H. Finkelstein_____
Burton H. Finkelstein
Mila F. Bartos
Karen J. Marcus
Finkelstein Thompson, LLP

The Duval Foundry
1050 30th Street NW
Washington, D.C.  20007
Telephone: (202) 337-8000
Fax: (202) 337-8090


**FINKELSTEIN THOMPSON, LLP**


By_____*/s/ Rosemary M. Rivas*_____
Rosemary M. Rivas
Mark L. Punzalan
Finkelstein Thompson, LLP
100 Bush Street, Suite 1450
San Francisco, CA  94101
Telephone: (415) 398-8700
Fax: (415) 398-8704


**FUTTERMAN HOWARD WATKINS WYLIE &
ASHLEY, CHTD.**


By_____*/s/ John R. Wylie*_____
John R. Wylie
Futterman Howard Watkins Wylie & Ashley, Chtd.
122 S. Michigan Ave.
Suite 1850
Chicago, IL 60603
(312) 427-3600
Fax: (312) 427-1850
Email: jwylie@futtermanhoward.com


**GILL ELROD RAGON OWEN & SHERMAN**


By_____*/s/ Dylan Potts*_____
Dylan Potts
425 W. Capitol Ave., Ste. 3801
Little Rock, AR  72201
Telephone: (501) 376-3800
Fax: (501) 372-3359
potts@gill-law.com

**GOLD & COULSON**


By_____*/s/ Arthur S. Gold*_____
Arthur S. Gold

- 62 -

11 South LaSalle Street
Suite 2402
Chicago, IL 60603
Telephone: (312) 372-0777
Fax: (312) 372-0778
asg@gcjustice.com

**HARKE & CLASBY LLP**

By_____*/s/ Lance A. Harke, P.A.*_____
Lance A. Harke, P.A.
David Maher
155 South Miami Avenue, Suite 600
Miami, FL  33130
Telephone: (305) 536-8220
Fax: (305) 536-8229

**HEWELL LAW FIRM, APC**

By_____*/s/ Harold M. Hewell*_____
Harold M. Hewell
402 W. Broadway
Fourth Floor
San Diego, CA 92101
Telephone: 619-235-6854
Fax: 619-235-9122
hmhewell@hewell.com

**JON EARDLEY LAW OFFICES**

By_____*/s/ John J. Eardley*_____
Jon J. Eardley
16020 Puesta Del Sol
Whittier, CA 90603
Telephone: (562) 947-2006
Fax: (562) 947-2006
jjeardley3@gmail.com

**LARRY D. DRURY, LTD**

By_____*/s/ Larry D. Drury*_____
205 West Randolph, Suite 1430
Chicago, IL  60606
Telephone: (312) 346-7950

**LASKY & RIFKIND**

By_____*/s/ Norman Rifkind*_____
Norman Rifkind
Leigh R. Lasky
Amelia S. Newton
350 North LaSalle Street
Suite 1320
Chicago, IL 60610
(312) 634-0057
rifkind@laskyrifkind.com
lasky@laskyrifkind.com
newton@laskyrifkind.com

**LAW OFFICES OF D. JOSHUA STAUB**

By_____*/s/ D. Joshua Staub*_____
PO Box 1914
Santa Monica, CA 90406
Telephone: (310) 576-7770
Fax: (310) 496-0702

**LAW OFFICES OF HOWARD M.
RUBENSTEIN**

By_____*/s/ Howard M. Rubenstein*_____
914 Waters Avenue, Suite 20
Aspen, Colorado 81611
Telephone: (832) 715-2788
howardr@pdq.net

**MCCRACKEN LAW FIRM**

By_____*/s/ Joanne M. McCracken*_____
Joanne M. McCracken
14909 N. Oak Street
Garfield, AR 72732
Telephone: (479) 359-1300
Fax: (479) 359-1308
joanne@jmccrackenlaw.com

**OFFICE OF WILLIAM G. CROMWELL**

By_____*/s/ William G. Cromwell*_____

William G. Cromwell
Two Ravinia Drive Suite 1270
Atlanta, GA 30346
Telephone: (770) 671-0900
cromwell_law@bellsouth.net

**PATTON ROBERTS, PLLC**

By_____*/s/ James C. Wyly*_____
James C. Wyly
Jack T. Patterson
Jeremy Y. Hutchinson
Century Bank Plaza, Suite 400
P.O. Box 6128
Texarkana, Texas 75505
Telephone: (903) 334-7000
Fax: (903) 334-7007
jwyly@pattonroberts.com
srommel@pattonroberts.com
jpatterson@pattonroberts.com
jhutchinson@pattonroberts.com

**POTTS LAW FIRM, LLC**

By_____*/s/ Derek H. Potts*_____
Derek H. Potts
Timothy L. Sifers
908 Broadway
3rd Floor
Kansas City, MO 64105
Telephone: (816) 931-2230
Fax: (816) 931-7030
dpotts@potts-law.com
tsifers@potts-law.com

**SCHARNHORST, AST & KENNARD, PC**

By_____*/s/ Daniel L. McClain*_____
Daniel L. McClain
Jeffrey A. Kennard
1000 Walnut St.
Suite 1550
Kansas City, MO 64106
Telephone: (816) 268-9411
dlm@sakfirm.com
jak@sakfirm.com

**SMITH & LOWNEY, PLLC**

By_____/s/ Richard A. Smith_____
Richard A. Smith
Eric D. Lowney
Bridget A. Baker-White
Brian Alan Knutsen
2317 E. John Street
Seattle, WA 98112
Telephone: (206) 860-2883
Fax: (206) 860-4187
rasmithwa@igc.org
knoll@igc.org
bridgetbw@igc.org
briank@igc.org

**THE LAW OFFICES OF ARON D. ROBINSON**

By_____/s/ Aron D. Robinson_____
Aron D. Robinson
19 S. LaSalle Street, Suite 1300
Chicago, IL  60603
Telephone: (312) 857-9050
Fax: (312) 857-9054


**THE SMOLAR FIRM**

By_____/s/ Yehuda Smolar_____
Yehuda Smolar
Suite 900
200 Galleria Parkway
Atlanta, GA 30339
Telephone: (404) 525-3900
firm@smolarpc.com

**TURNER & MAASCH, INC.**

By_____/s/ Mark Maasch_____
Mark Maasch
550 West "C" Street, Suite 1150
San Diego, CA  92101
Telephone: (619) 237-1212
Fax: (619) 237-0325

**ZIMMERMAN LAW OFFICES, P.C.**

By     */s/ Thomas A. Zimmerman, Jr.*
Thomas A. Zimmerman, Jr.
Hugh J. Green
100 W. Monroe Street
Suite 1300
Chicago, IL 60603
(312) 440-0020
tom@attorneyzim.com
hugh@attorneyzim.com

## CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2009, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send a notice of electronic filing to all persons registered for ECF as of that date.

_____/s/ *Thomas V. Bender*_____